UNITED STATES ET AL. *v.* BALTIMORE & OHIO RAILROAD CO. ET AL.

No. 223.  Argued February 3–4, 1948.—Decided March 8, 1948.

*Frederick Bernays Wiener* argued the cause for the United States and the Interstate Commerce Commission, appellants. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Edward Dumbauld, Daniel W. Knowlton* and *Edward M. Reidy.*

*William N. Strack* and *John P. Staley* submitted on brief for Swift & Co., appellant.

*Robert R. Pierce* argued the cause for the Baltimore & Ohio Railroad Co. et al., appellees. With him on the brief were *Harold H. McLean, Leo P. Day, George H. P. Lacey, Willis T. Pierson, John A. Duncan* and *Francis R. Cross.*

*Ashley Sellers* argued the cause for the Cleveland Union Stock Yards Co., appellee. With him on the brief were *Matthew S. Farmer* and *Carl McFarland.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This case is properly here on appeal, 28 U. S. C. § 345, from a district court decree enjoining enforcement of a cease and desist order of the Interstate Commerce Commission. 71 F. Supp. 499. The order enjoined required the five railroad appellees [1] to abstain from refusing to deliver interstate shipments of livestock to the sidetrack of Swift & Company's packing plant at Cleveland, Ohio, and to establish tariffs for such deliveries. Swift's sidetrack has only one connection with a railroad. That connection is with the main line of the New York Central by way of a spur track, known as "Spur No. 245," operated by that railroad. One end of this spur owned by the New York Central connects with its main line; the other end of the spur, also owned by the railroad, connects with Swift's sidetrack and with other private sidetracks. A 1619-foot middle segment of the spur, known as "Track 1619," is owned by the Cleveland Union Stock Yards Company. Under the terms of a trackage agreement with Stock Yards, New York Central uses Track 1619 for deliveries to Swift's sidetrack and other private sidetracks connected with Spur No. 245. Thus all interstate railroad shipments to Swift's siding and to others similarly located can be made only over the segment of track owned by Stock Yards. Because of its interest in Track 1619, Stock Yards was made a party to the proceedings before the Commission and was included in its cease and desist order along with the railroads. [2]

---

[1] The railroad appellees are Baltimore & Ohio Railroad Company, the Erie Railroad Company, the Wheeling & Lake Erie Railroad Company, the New York Central Railroad Company, and the Pennsylvania Railroad Company.

[2] Appellees argue that Stock Yards was improperly made a party and that the Commission was without power to include Stock Yards in its cease and desist order. We think § 2 of the Elkins Act, 32

So long as Stock Yards continues to own Track 1619, delivery of livestock and other freight by New York Central to Swift and others similarly located depends upon whether and to what extent Stock Yards will grant or has granted New York Central a right to operate over Track 1619. This present case involves the question of whether the railroads, and particularly New York Central, in making deliveries of livestock over Track 1619 to Swift's sidetrack must comply with certain conditions imposed by Stock Yards in its present agreement with New York Central.

Track 1619 was constructed in 1899 on Stock Yards' property by Stock Yards and New York Central's predecessor in interest. A contemporaneous written agreement, cancellable on 60-days' written notice by the railroad, gave the railroad a right to use the track for railroad purposes, provided the use did not interfere with Stock Yards' business. In 1910, after negotiations with the railroad, Swift built its sidetrack, and the railroad extended its Spur No. 245 by a track which connected Track 1619 with Swift's siding. The 1899 written trackage agreement was superseded by another in 1924. This one was cancellable by either party on 30-days' written notice. It provided that the railroad should maintain the tracks at its own expense, and it granted to the railroad "the free and uninterrupted use of any and all tracks or portions thereof belonging to the Industry and located on its land." From 1910, when Swift's siding was constructed,

Stat. 848, 49 U. S. C. § 42, justified the Commission's action and find no merit to the contention that we should by interpretation restrict that section's broad language authorizing inclusion as parties of "all persons interested in or affected by the rate, regulation, or practice under consideration" by the Commission or by a court, and which provides that decrees may be made with reference to such additional parties to the same extent as though they were carriers.

to 1924, and for many years thereafter, the railroad continued to deliver all kinds of commodities to Swift and to other packers likewise served only by way of Spur No. 245 and Track 1619.

In the early 1930's Stock Yards concluded that it was losing patronage and fees because of delivery of livestock to Swift at its siding. A large part of Stock Yards' income comes from fees it charges for unloading and delivering interstate shipments of livestock to pens within its yard. Stock carried over Track 1619 to Swift's siding and to other private sidings are unloaded at those sidings; as a result Stock Yards loses the fees it would receive if livestock consigned to Swift and to other packers were unloaded at the Stock Yards. With a view toward collecting unloading fees from Swift and other packers served by Spur No. 245, Stock Yards instituted negotiations with the New York Central which in 1935 resulted in a modification of their 1924 agreement. The old 1924 agreement had unconditionally granted "Railroad, (a) the free and uninterrupted use of any and all tracks . . . ." The 1935 modified agreement also granted New York Central "the free and uninterrupted use" of Stock Yards' tracks, but added "except for competitive traffic a charge for which use shall be the subject of a separate agreement."

After this 1935 restrictive modification Stock Yards demanded that the railroad adopt one of two courses with regard to livestock, which the parties agreed was the "competitive traffic" the modified agreement was designed to suppress. The railroad must either stop carrying livestock over Track 1619 to Swift and other packers or pay Stock Yards, for use of Track 1619 in carrying livestock to these packers, an amount equivalent to fees Stock Yards would have collected had the livestock consigned to them been unloaded and delivered in the yard. This amount was considered exorbitant by New York Central and the

other railroads for whom New York Central performed switching charges, and they therefore refused to pay it. The result was that in 1938 the railroads ceased delivering livestock to the sidings of Swift and other packers served by Spur No. 245,[3] although they have under agreement with Stock Yards continued to use the spur for delivery of all other kinds of commodity shipments to these sidings. Swift demanded that the railroads deliver livestock to its siding, and in 1941 filed a complaint with the Interstate Commerce Commission upon their refusal to make deliveries.

After notice and hearing the Commission concluded that the railroad's refusal to carry livestock to Swift violated several provisions of the Interstate Commerce Act. It was found to violate § 3 (1) because of the discrimination against a single commodity, livestock, and because New York Central's deliveries of livestock to the sidetracks of some of Swift's nearby competitors, whose sidings were served without using Track 1619, subjected Swift to undue prejudice and gave those competitors an undue preference. The Commission also found that the failure to deliver under the circumstances shown was a violation of § 1 (6) which forbids unreasonable practices affecting the manner and method of delivering freight, and also a violation of § 1 (9) which requires railroads to operate switch connections with private side tracks

---

[3] In 1938 New York Central ceased to switch livestock carloads of other carriers over Spur No. 245 to Swift's siding, and it canceled its tariffs for this service. Since that time there has been no specific tariff authority for movement of livestock to Swift's siding when shipped to Cleveland over lines other than the New York Central. Although New York Central has never canceled its tariff for livestock shipments to Swift's Cleveland siding from points of origin on its own lines, it has delivered all livestock consigned to Swift's siding to Stock Yards since 1938. Swift has been forced to pay charges to Stock Yards to obtain possession of livestock unloaded at the yards.

without discrimination under such conditions as the Commission found to exist here.

The Commission's findings of fact are not challenged. There can be no doubt that those facts found would constitute a violation of the sections referred to if Spur No. 245 were wholly owned by the railroad. Ownership of Track 1619 by Stock Yards and its objection to livestock deliveries is, in fact, the only reason suggested for the railroads' failure to deliver shipments of livestock to Swift as they do to neighboring packers, and for their failure to provide switching connections for livestock shipments. From what has been said our question is this: Can the non-carrier owner of a segment of railroad track who contracts for an interstate railroad's use of the segment as part of its line reserve a right to regulate the type of commodities that the railroad may transport over the segment, or would such a reservation be invalid under the Interstate Commerce Act?

The Interstate Commerce Act is one of the most comprehensive regulatory plans that Congress has ever undertaken. The first Act, and all amendments to it, have aimed at wiping out discriminations of all types, *New York* v. *United States,* 331 U. S. 284, 296, and language of the broadest scope has been used to accomplish all the purposes of the Act. *United States* v. *Pennsylvania R. Co.,* 323 U. S. 612, 616. It would be strange had this legislation left a way open whereby carriers could engage in discriminations merely by entering into contracts for the use of trackage. In fact this Court has long recognized that the purpose of Congress to prevent certain types of discriminations and prejudicial practices could not be frustrated by contracts, even though the contracts were executed before enactment of the legislation. See *Philadelphia, Balt. & Wash. R. Co.* v. *Schubert,* 224 U. S. 603, 613–614; *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 483, 485–86.

We think the provisions of the Interstate Commerce Act plainly empowered the Commission to enter this order against the discriminatory practices found, despite ownership of Track 1619 by Stock Yards. Section 1 (1) (a) makes the Interstate Commerce Act applicable to common carriers "wholly by railroad." Section 1 (3) (a) defines the term "railroad" as including "all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks . . . ." As one of the many other indications that Congress did not intend its railroad regulatory provisions to depend on who had legal title to transportation instrumentalities, § 1 (3) (a) also provides that the word "transportation" as used in the Act shall broadly include "locomotives . . . and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof . . . ." It is true, as appellees argue, that the above language of § 1 (3) (a) is definitional only. *Ellis* v. *Interstate Commerce Comm'n,* 237 U. S. 434. But it is also true that these definitions by their unambiguous language make all trackage "in use by any common carrier" subject to the regulatory provisions of the Act, even though not owned by the carrier but only used by it under a contract or agreement. Thus Track 1619, though owned by Stock Yards, was subject to the Act because of its use by the New York Central under trackage agreements.

It is just as prejudicial to shippers and the public for a railroad that uses a portion of track under lease or contract to discriminate as it is for the discrimination to be inflicted by a railroad that owns its entire track. Practically the only argument suggested to justify discriminatory practices under the circumstances here is that an owner has a right to let others use his land subject

to whatsoever conditions the owner chooses to impose. It is even argued that to construe the Interstate Commerce Act as limiting that right would result in depriving an owner of his property without due process of law. But no such broad generalization can be accepted. Property can be used even by its owner only in accordance with law, and conditions its owner places on its use by another are subject to like limitations. Of course it does not deprive an owner of his property without due process of law to deny him the right to enforce conditions upon its use which conflict with the power of Congress to regulate railroads so as to secure equality of treatment of those whom the railroads serve.

Here Congress under its constitutional authority has provided that no railroad shall engage in certain types of discriminatory conduct in violation of three provisions of the Act. The Commission found that discriminatory conduct here. The excuse offered by the railroads is that the owner of Track 1619 required them to do the prohibited things. But the command of Congress against discrimination cannot be subordinated to the command of a track owner that a railroad using the track practice discrimination.

We hold that the Commission's order was authorized by statute and that it does not deprive Stock Yards of its property without due process of law. In doing so we do not pass upon any questions in relation to the dedication of Track 1619 to railroad use. Neither do we decide what are the relative financial rights of Stock Yards and New York Central under their contracts, nor whether Stock Yards can cancel the contract with New York Central, nor what would be the duty of New York Central should Stock Yards attempt to terminate its right to use Track 1619. We only hold that Stock Yards' ownership of Track 1619 does not vest it with power to compel

the railroads to operate in a way which violates the Interstate Commerce Act.

The Commission's order is valid and should be enforced.

*Reversed.*

Mr. Justice Burton, dissenting.

For the reasons stated in the opinion of the District Court in this case, 71 F. Supp. 499, I believe that the order of the Interstate Commerce Commission exceeded its jurisdiction and that the judgment permanently enjoining the enforcement of such order should have been affirmed.