**BROOKLYN EASTERN DISTRICT TERMINAL, Plaintiff,**

v.

**The UNITED STATES of America, Defendant,**

and

**Interstate Commerce Commission, R. & F. Trucking Co., Inc., M. J. Kelly Company, Inc. and North 4th Street Realty Corp., Intervening Defendants.**

No. 68 C 239.

United States District Court
E. D. New York.

Aug. 7, 1969.

Louis H. Shereff, and Harry Shereff, New York City, for plaintiff.

Jerome E. Sharfman (Edwin M. Zimmerman, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, and Joseph P. Hoey, Brooklyn, N. Y., of counsel, for the United States, and Robert W. Ginnane, Washington, D. C., of counsel, for intervening defendant I. C. C.), for the United States and the I. C. C.

Arthur J. Piken, Jamaica, N. Y., for intervening defendants R. & F. Trucking Co., Inc., M. J. Kelly Company, Inc., and North 4th Street Realty Corp.

Before MOORE, Circuit Judge, and DOOLING and JUDD, District Judges.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Plaintiff's action is brought to enjoin and annul 1967 Orders of the Interstate Commerce Commission [28 U.S.C. § 1336 (a), (c)] which denied plaintiff the right to abandon certain track which it operated in Block 2349 of its Kent Avenue terminal on the East River waterfront in the Williamsburgh section of Brooklyn [28 U.S.C. §§ 2284, 2321–2325; 49 U.S.C. § 17(9)]. It is concluded that the relief sought must be denied.

Plaintiff has operated since 1940 as a common carrier subject to the Interstate Commerce Act. Plaintiff picks up freight cars on car floats in Jersey City and Weehawken from trunk line railroads (including the Pennsylvania [1], New York Central [1], Baltimore & Ohio, etc.), and tows the cars to three float bridges and connecting track at plaintiff's Kent Avenue station on the waterfront in Williamsburgh. There plaintiff classifies the cars and distributes them to a complex of team tracks and industrial sidings located on a grid of regular-sized city blocks cut out and bounded by the regular city streets. Plaintiff has about 8.01 miles of track in its Kent Avenue station; the station extends from south of North 4th Street to North 11th Street, and from the river across Kent and Wythe Avenues to Berry Street; some of plaintiff's track traverses the city streets under city-granted franchises.

In March 1966 plaintiff applied to the Interstate Commerce Commission under Section 1(18) and (20) of the Interstate Commerce Act [49 U.S.C. § 1(18), (20)] for a certificate of public convenience and necessity permitting it to abandon the portion of its line of railroad consisting of 0.28 miles of its track in Blocks 2349 and 2350. Plaintiff was then still serving three shippers in Block 2349, R. & F. Trucking Co., Inc., M. J. Kelly Co., Inc., and Bridge Lumber Co.; it had served, but it was no longer serving Greenberg Brothers in Block 2350. The R. & F. freight was furniture, the Kelly freight, firebrick and cements, and the Bridge Lumber Company freight, lumber. Plaintiff averred that to continue to operate the track was uneconomical and would burden Interstate Commerce since total revenue from the shippers in the two blocks was far less than the cost of operating and maintaining the tracks therein, and, upon abandonment, the land could be sold and the money used either to reduce the mortgage on the property, saving interest, or to improve the balance of railroad operation, leaving the users of the

1. Now Penn Central

track in Block 2349 to get their deliveries at the team tracks located in the nearby Blocks 2332, 2333 and 2334. The abandonment, plaintiff argued, would avert increasing economic hardship and financial loss that would otherwise jeopardize future service to the shipping public served by the applicant.

The Commission denied leave to abandon track in Block 2349, but, there being no opposition, granted leave to abandon the track in Block 2350.

The gist of plaintiff's contention has been that it has lost money over the years on its entire operation, that, specifically, it loses money in Block 2349, and, still more specifically, that it handles the R. & F. furniture traffic in Block 2349 at a heavy loss. In addition plaintiff argues that over and above the improvement in its Net Revenue from Railway Operations that would flow from eliminating the Block 2349 revenue derived from R. & F. and Kelly and the related excess of railway operating expenses over the revenues eliminated, there would be secondary savings achieved in this way: If the abandonment is approved, plaintiff will sell to Bridge Lumber Company the balance of the real estate, including that underlying the abandoned track, owned by plaintiff in Block 2349, and will use the proceeds of sale to pay down the mortgage on the property, thus eliminating substantial interest and tax expense.

The hearing examiner, rendering his report and order on a record made before another examiner who had meanwhile retired [5 U.S.C. § 554(d)], found that plaintiff had sustained overall losses for some years, but that it was not clear either that the abandonment would rectify the situation, or—in view of an apparent year by year increase in net current assets—that plaintiff was in financial jeopardy. Noting plaintiff's use of working capital to build a new flour terminal, and its use of the proceeds of realty sales to improve its working capital and retire $250,000 of bonds, thus diminishing its fixed charges, the Examiner asserted that railway operating revenues substantially exceeded operating expenses in the most recent five year period, and that the plaintiff as a carrier "had a favorable operating ratio." On plaintiff's contention that abandoning a part of its line in Block 2349 would help it improve its railway economics (even though it could not lay off any railroad men), the Examiner observed that although the abandonment would clear the way to sell property to Bridge Lumber Company, it would also eliminate the R. & F. and Kelly revenue without demonstrably eliminating railway operating expenses in excess of the lost revenues, and would only in a conjectural and unsubstantiated degree gain increased traffic with Bridge Lumber Company. Noting further that the only assured savings would be mortgage interest of $3,456, taxes of $1,985.22 and city franchise charges of $108. per year resulting from the land sale to Bridge, the Examiner commented that R. & F. and Kelly had testified that to lose the siding service would reduce the value of the property they occupied by an amount per square foot exceeding the square foot price at which plaintiff was to sell its 20,000 square feet of land to Bridge. The Examiner concluded, on the general issues, that plaintiff had not borne the burden of proving with acceptable evidence that the present and future public convenience and necessity permitted the abandonment proposed. With particular reference to plaintiff's emphasis on is losses on the R. & F. traffic, and the contention that it was transported for an inadequate compensation, the Examiner pointed out that since 1922 plaintiff had made no effort to renegotiate with the interchange carrier the division it received on furniture.

Review Board No. 5 concluded that the case did not require the issuance of a report by the Review Board discussing the evidence in the light of the pleadings since it appeared that the Findings and Conclusions of the Examiner on the matters of fact and law were in material respects proper and correct and that the exceptions of plaintiff raised no new or material matters of fact and law not

adequately considered and properly disposed of by the Examiner in his report [cf. 5 U.S.C. § 557(c)]. Review Board No. 5 accordingly made a completely general finding that the evidence, in the light of the exceptions and replies thereto, did not warrant a result differing from that reached by the Examiner, and that the statements of facts and the conclusions and findings of the Hearing Examiner, being proper and correct in all material respects, were affirmed and adopted. The Examiner's order denying the abandonment was adopted as the order of Review Board No. 5 without further hearing and argument. (Later Division 3 of the Commission, acting as an Appellate Division, modified the earlier decision to the extent of permitting abandonment of the Track in Block 2350 on the ground, essentially, that there had been no objection to it.)

In this Court plaintiff repeats its basic substantive contention that denial of the application to abandon was confiscatory in light of plaintiff's long continued overall losses and the specific loss incurred on the Block 2349 traffic with R. & F. particularly. Plaintiff challenges the validity of the Examiner's conclusion that the generality and conclusory nature of plaintiff's evidence resulted in a failure of proof, and it argues that the Commission should have granted its application to re-open the proceeding to present more specific evidence if it was indeed required. Plaintiff argues that the Commission should not have permitted a substitute Examiner to make findings on a record made before another Examiner [5 U.S.C. § 554(d)] and, that the Commission itself failed to act correctly in passing on the exceptions presented to the Examiner's decision in giving a single generalized ruling rather than "the ruling on each * * * exception" required by 5 U.S.C. § 557(c). Finally, and for the first time in the present proceeding, plaintiff contends that the track which it sought to abandon was "spur, industrial, * * * or side tracks, located * * * wholly within one State," and, hence, that the Commission had no jurisdiction to entertain the proceeding at all [49 U.S.C. § 1(22)].

■ 1. Plaintiff's confiscation argument fails because the data of record are insufficient to support the claim. The confiscation contention breaks naturally into an argument first about the overall figures for the plaintiff as a company. The evidence on this consists essentially of Exhibits 1 and 2 before the Commission (a testimonial narrative of plaintiff's basic factual showing, and supporting financial and statistical material, Tr. 5–6), and of the tabular material in plaintiff's "Return To Questionnaire" of April 6, 1966.

Exhibit 2 annexed to the Return To Questionnaire shows that in the years 1961 through 1965 plaintiff's "operating ratio" was, as the Examiner said, "favorable" in the limited sense that plaintiff's Net Revenue from Railway Operations varied from a high of 17.6% of revenues to a low of 12.2%, and it was 14.2% in 1965. Railway Net Operating Income, before allocation of fixed charges, was a black figure for all years except 1961 for which a loss of $28,281. was shown. The Net Railway Operating Income is small viewed as a return on net transportation property shown in Exhibit 1 of $2,428,710, without taking account of working capital over and above transportation property. The figures are:

| YEAR | NET RAILWAY OPERATING INCOME |
|---|---|
| 1961 | ($28,281) |
| 1962 | $74,830 |
| 1963 | $28,538 |
| 1964 | $93,979 |
| 1965 | $92,742 |

If the figures are solid (contrast those given in the Exceptions, pp. 8–9), denial of leave to abandon the entire railroad would very likely be confiscatory. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 1920, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323. Plaintiff, however, has elected to continue to

operate as a railroad, not with a Net Railway Operating Loss, but with a low Net Railway Operating Income.

The corporate loss overall for the years 1954 through June 30, 1966, of approximately $934,000 (page 5 of hearing Exhibit 1) is not demonstrably a Railway Operating Loss. Leaving to one side the effect of the "other income" and "other expense" accounts, which in some years increased income available for fixed charges and in others (*e. g.*, 1963 and 1965) reduced it, the first mortgage bond interest of over $120,000 a year through the end of 1965 alone accounts for more than the accumulated loss of $934,000. But it does not appear what, if any, part of the bond interest expense properly belonged in the railway accounts. The bonds are spoken of as secured by a real estate mortgage, and plaintiff's real estate is evidently carried at now meaningless valuations determined in the 1920s (Tr. 30). That proceeds of real estate sales were used to reduce the mortgage debt indicates that the debt in some part certainly is related to the "Miscellaneous Physical Property (Non-Operating)" and to the "other income" accounts (see Tr. 24–30), and so does the fact that the debt itself was evidently not contracted until the end of 1959 (Tr. 30). The record does not reflect the extent to which the plaintiff was in effect a real estate holding company, nor does it afford any means of sorting out plaintiff's classes of income, except as that may be done from the account titles shown in the financial exhibits.

■ While the corporation had long-continued, overall corporate book-losses, the evidence does not indicate that the total railway operation was conducted at a loss; as noted, it may well not have been conducted at a fair rate of return. But, assuming that to be the case, the abandonment rights which the absence of a fair rate of return may give a railroad are not easily defined. In Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 1920, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323, the Court held

that a company could not be required to continue a losing railroad operation subsidized by the non-railroad business of the company; in the course of decision Mr. Justice Holmes remarked almost casually (251 U.S. at 399, 40 S.Ct., at 184) that, "A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage." But, as Mr. Justice Holmes was quick to intimate, and as it was later held, the right to abandon the whole railroad operation because it does not yield a fair return does not imply a right to abandon a losing branch if the carrier elects to continue the balance of its operations. Fort Smith Light & Traction Co. v. Bourland, 1925, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631; *cf.* Western & Atlantic R. R. v. Georgia Public Service Commission, 1925, 267 U.S. 493, 496–497, 45 S.Ct. 409, 69 L.Ed. 753. Compulsion to continue a service rendered at a loss is not necessarily an unconstitutional taking of property, since there is no general principle that every component of an integral whole of utility service must show a profit. As it was put in Atlantic Coastline R. R. v. North Carolina Corporation Commission, 1907, 206 U.S. 1, 26–27, 27 S.Ct. 585, 51 L.Ed. 933, it is not unreasonable, in the due process perspective, to require a carrier to continue to furnish a facility which is a part of what it is its general duty to furnish for the public convenience simply because a loss is incurred in the performance of that duty, although the fact of loss is one —and an important—criterion to take into account in determining the reasonableness of an order requiring the continued extension of the facility. Chesapeake & Ohio Ry. v. Public Service Commission of State of West Virginia, 1917, 242 U.S. 603, 607–608, 37 S.Ct. 234, 61 L.Ed. 520; Puget Sound Traction, Light & Power Co. v. Reynolds, 1917, 244 U.S. 574, 581, 37 S.Ct. 705, 61 L.Ed. 1325; *see* Alabama Public Service Commission v. Southern Railway Co., 1951, 341 U.S. 341, 347, 71 S.Ct. 762, 95 L.Ed. 1002. Compelled continuance of a particular service can amount to a forbidden taking of prop-

erty without due process of law. But whether a facility or service maintained at a loss can be abandoned involves a broader analysis than a simple demonstration of segmental loss. The decision of whether an order to continue a service or facility is unreasonable requires consideration of the loss as one factor, but also requires taking account of the relation of the particular service or facility to the whole service that the carrier has undertaken or is bound to render, the public service value of continuance of the service or facility, and any other factors that contribute to a determination of whether the service or facility and its losses can be considered in isolation from the rest of the public service involved. As so often, a complex balancing of interests is involved. *Cf.* State of Colorado v. United States, 1926, 271 U.S. 153, 168–169, 46 S.Ct. 452, 70 L.Ed. 878; Southern Railway Co. v. North Carolina, 1964, 376 U.S. 93, 104–105, 84 S.Ct. 564, 11 L.Ed.2d 541; State of Nebraska ex rel. Nebraska State Ry. Commission v. United States, D.Neb.1966, 255 F.Supp. 718, 722.

Plaintiff, therefore, argues in a second phase of its confiscation contention that its overall inadequacy of railway operating net income supports the right to abandon the particular track here allegedly involved because of the two-fold circumstance that the traffic in Block 2349 is loss traffic, and the abandonment will make possible the land sale and the interest, tax and franchise savings already discussed. The land-sale saving is hardly large enough to be critical in the overall loss record of the company, but such as the saving is, it is real. The saving, however, does not relate to the railway operating problem. While the sale to Bridge is contingent on the abandonment of the track, that is a factitious relation, created by the agreement between the plaintiff and Bridge. There is

no showing that the real estate could not be sold subject to siding easements for substantially the same consideration, if not to Bridge, then to the protesting shippers, R. & F. or Kelly. It has been said that, "Not every change in ownership or mode of operation constitutes an abandonment." City of Alexandria v. Chicago, Rock Island & Pacific R. Co., 5th Cir. 1962, 311 F.2d 7, 10.

The argument that the traffic in Block 2349 is carried at a differentially heavy loss, and that the loss will be eliminated if the service is amputated, is not made good. Plaintiff concedes that its computed labor savings would not enable it to lay men off, and that has been treated as if it disposed of the argument that abandonment will improve the road's economics. But the labor economy arising from the abandonment of a particular set of activities would be nonetheless real and no less to be taken into account simply because the same amount of effort can, and will, in the judgment of management, be employed to better other parts of the operation.

The questions, then, would appear to be, first, whether the traffic in Block 2349 in fact produces losses, so that its abandonment would improve the company's railway economics, second, whether the portion of the railroad sought to be abandoned is genuinely an isolable and severable portion of the line of railroad, and, finally, whether the economic case for abandonment is so clear as to outweigh the disadvantages, if any, that the abandonment will occasion to shippers and the public.

*First:* Three shippers are located in Block 2349, R. & F., Kelly and (starting in the latter part of 1965) Bridge Lumber Company; the number of cars supplied by each shipper in the years for which data are given was:

| Year | R. & F. | Kelly | Bridge |
|------|---------|-------|--------|
| 1963 | 685 | 111 | — |
| 1964 | 733 | 97 | — |
| 1965 | 633 | 88 | 222 |
| 1966 (6 mos.) | 320 | 46 | — |

The record indicates that for the year 1965 the plaintiff handled a total of 20,-181 cars, so that, at the traffic rate prevailing in the latter part of 1965, the cars handled on Block 2349 are about 5% of the total.

The average freight per car received by plaintiff from the three shippers, so far as the data appear of record, was as follows:

| Year | R. & F. | Kelly | Bridge |
|---|---|---|---|
| 1963 | $22.27 | $168.79 | – |
| 1964 | 20.94 | 166.94 | – |
| 1965 | 20.54 | 167.55 | $120.00 |
| 1966 (6 mos.) | 20.68 | 163.40 | – |

Using again 20,181 as the number of cars handled by plaintiff in 1965, it appears that the freight plaintiff received per average car was $111.78 (using the top line figure from Exhibit 2 of the Return to Questionnaire).

The revenue on the R. & F. freight is startlingly low as a rate per car; both the Bridge and the Kelly average revenues per car are somewhat higher, and, in the case of Kelly, very markedly higher than the plaintiff's average freight received per car. Plainly differences in revenue could be due to differences in average car weights among commodities and to differences in line-haul rates among commodities. Using 20,-181 cars and the 1965 weight of freight carried as shown in Hearing Exhibit 2, Page 4, the cars plaintiff handled averaged 40.3 tons of freight, and the average revenue, figured on the same basis, approximated $2.77 a ton. Using 1965 figures only, the average Kelly car carried 49.95 tons of freight, and the revenue to plaintiff approximated $3.36 per average ton. R. & F. in 1965 averaged only 8.07 tons per car, and the revenue per ton averaged $2.54, a smaller amount per ton than either the overall average for the railroad or the average for the Kelly traffic.

The evidence in the record about the line-haul rates for the Kelly and R. & F. traffic is meagre but it suffices to show that the . total freight received on furniture cars for the complete carry from point of origin to plaintiff's Kent Avenue terminal is not nearly so radically out of line as is plaintiff's revenue from the furniture cars as contrasted to its revenue from Kelly's brick cars and from the average of all cars.

The manager of R. & F. testified (Tr. 212–213) that the carload furniture rates from Bassett, Virginia (the point of origin) to New York varied with the weight of the car and were as follows:

| Weight of Car (in pounds) | Rate Per Cwt. |
|---|---|
| 10,000 | $2.02 |
| 12,000 | 1.78 |
| 15,000 | 1.62 |

That would mean, in the case of R. & F. 1965 cars carrying an average 8.07 tons per car, that they would move on average at $1.62 a hundred weight or $32.40 per ton which works out to a line-haul rate of about $261 an average 1965 car.

Plaintiff's operating superintendent testified that for a 103,993 pound car of Kelly's brick the carrier's charge for the whole journey was $363.98 and the plaintiff's share of that was $161.19 (Tr. 182–183). There was testimony that the total line-haul rate on Kelly firebrick was $7.00 a ton for cars at and above 45 tons and $8.50 a ton for 30 ton cars (Tr. 265–267). Plaintiff's charge to Kelly for its service came to $3.39 in 1963, $3.31 in 1964 and $3.36 in 1965 per ton for cars that averaged 49 and 50 tons per car in the three year period. The Kelly firebrick appears to have originated in

Central Pennsylvania for the most part, with some coming from Ohio and some from Missouri (Tr. 262).

Thus plaintiff receives a little less than 8% of the rate on the R. & F. furniture, and over 40% of the rate on the firebrick, a contrast in rate division that is not explained by the difference in the length of the line-hauls, or by any calculable difference in terminal costs as against line-haul costs.

Plaintiff offered satisfactory evidence that traffic destined for the tracks that plaintiff sought to abandon, when the cars were handled through Block 2341, involved a cost of $19.81 for the labor of moving a train of cars from the lead track in the Kent Avenue yard after classification to the tracks used by R. & F. and Kelly. The costs were attributed to the tight curves of the track leading from Block 2332 across Kent Avenue, along North Fifth Street, through an alley in Block 2341, across North Fourth Street and curving again tightly into Block 2348 across Kent Avenue, at which point the cars could be reversed and run to the tracks serving R. & F. and Kelly. Much testimony discussed the handling of fifty foot rather than forty foot cars around the curves, the make-up of yard-trains, and the number of times when R. & F. ordered single cars delivered. But the fair purport of all of the testimony was that the direct labor cost of handling cars for R. & F. through the curve in Block 2341 from the classification point to rest on the siding averaged four or five dollars a car. But the cost of four or five dollars per car for this movement was simply a particularly high cost sample of the costs of moving cars from the classification point to any track in the terminal. The effect of the evidence is markedly diminished since Bridge cars handled to Block 2349 would have to be taken through the same set of maneuvers, as would all of the traffic in Block 2348 [2] lying between Block 2349 and the riverfront. The number of cars received for patrons in Block 2348 in 1965 was 1,363.

Plaintiff sought also to show that its average cost for direct labor and fuel for handling a loaded car from pickup in New Jersey to delivery at the team track or siding was $38.415. The Examiner criticised the showing as unsupported by valid evidence. Plaintiff argues that if there were a lack of valid evidence, plaintiff should have been permitted to reopen the case to supply the proof. The exact cost, even for labor and fuel, of the traffic into Block 2349 could never be incontrovertibly proved. Average figures are readily derived from Exhibit 2 in the "Return to Questionnaire" and from Hearing Exhibit 2, Pages 3, 4 and 6, and it is plain from this material that no manipulation of figures could make $20 a furniture car compensatory to plaintiff. Using the 1965 figure of 20,181 cars handled, it is seen from Hearing Exhibit 2, Sheet 6 that, since $463,000 of employee compensation paid was for "Marine Forces" and "Train and engine," this one labor cost roughly equalled $22.94 an average car; compensation for maintenance of way and structures labor amounted to somewhat more than $2.00 a car. Reference to the 1965 figures indicates that the Total Railway Operating Expenses (before Railway Tax Accruals, Hire of Freight Cars, etc.) approximated $1.36 a pound. The Railway Operating Expenses alone, if prorated to R. & F. 1965 cars on a poundage basis, would approximate $13,-925.45 against gross revenues from R. & F. for that year of $12,999. Enough was shown in the record to prove that the $20 a car for the R. & F. freight was inadequate and produced loss to plaintiff,

---

2. Apparently plaintiff had three float bridges serving Kent Avenue, two of them heading into Block 2332 between North Fifth and North Sixth Streets and apparently the third float bridge was somewhere north of North Seventh Street. Hence it appears that although the track west of Block 2348 and running to the waterfront reached certain pier properties, they were not equipped with float bridges and could not unload cars for direct handling into Blocks 2348, 2349 and 2350.

if it was proper to consider the twenty dollars a car as the revenue figure properly to be taken into account for abandonment proceeding purposes.

The difficulty with plaintiff's proofs about the R. & F. traffic is that the inadequate revenue on the R. & F. traffic has no relation to abandonment but rather implies the need for a fairer rate division with the line-haul carriers, and, secondly, that even if the abandonment were permitted, the professed willingness of plaintiff to continue to serve R. & F. at team tracks in Block 2332 would leave plaintiff with essentially the same loss traffic minus only the special cost of handling the cars around the curve in Block 2341 and switching them to the siding on order

■ Plaintiff stated at the hearing that the division was fair, and perhaps the mix of rates in the overall scheme of division is fair in aggregate result. If so, plaintiff cannot complain as against an individual shipper that one isolated rate is confiscatory as between that shipper and plaintiff. Moreover, where the issue is abandonment, plaintiff cannot prove its case against the protesting shippers by simply "admitting" that the division is fair; it must prove that; otherwise its remedy is not abandonment but renegotiation of the division or resort to the Commission ultimately for a fair division of the rate with the line-haul carrier. *Cf.* United States v. Great Northern Ry., 1952, 343 U.S. 562, 563–564, 577, 72 S.Ct. 985, 96 L.Ed. 1142; Secretary of Agriculture of United States v. United States, 1954, 347 U.S. 645, 652, 74 S.Ct. 826, 98 L.Ed. 1015; New York Central R. R. v. United States, S.D.N.Y.1962, 201 F.Supp. 958. If the division is in fact fair because it is rolled in with other divisions that compensate for the particular inadequacy on some acceptable basis, then the traffic is not definable as loss traffic.

Turning then to the second question, it is not apparent at all from the evidence that the "portion of its line of railroad"

sought to be abandoned is in fact an isolable and severable segment of railway property or service from an abandonment point of view. On the contrary, the "abandonment" has the effect of a discriminatory attempt to discontinue a service. There is no evidence that the R. & F. and Kelly sidings differ intrinsically from those in Blocks 2348 and 2340, or, indeed, from any other sidings in the Kent Avenue terminal. The expectation is that Bridge will get increased siding service in the same Block 2349. The conclusion compelled by the evidence is not that a portion of railroad is sought to be abandoned but that the traffic of two particular shippers is to be jettisoned in the hope of gaining increased traffic of another shipper.

■ The track sought to be abandoned is itself not demonstrably different in physical location, layout or accessibility or in general railway characteristics from other track in the terminal; its only defining characteristic seems to be that it is not team track. There is nothing wrong with the Kelly traffic nor with the R. & F. traffic—apart from the rate division—which so far as appears, could not equally be found wrong with other traffic in the yard. The traffic is not shown to be any costlier to handle on the Block 2341 curve than any one else's traffic, and there is no evidence that the density of service to the block is too light in comparison with the terminal taken as a whole. If at any time these apparently old tracks were properly maintained facilities under Section 1(3) (a) or (4) or (9) or (18) of the Interstate Commerce Act, some specifiable ground for abandonment of the track and service must be made to appear that is based on characteristics of the track or traffic that differentiate it from other service or track that is not being discontinued, and no such evidence appeared. Private track owned by the railroad appears to be common in the Kent Avenue terminal and is a part of a non-discriminatory service heretofore rendered.

Finally, the economic case for abandonment is not made out. The economics are to be improved not by the abandonment but by the land sale which does not necessarily connote abandonment. Savings on the traffic were not shown, but rather a possibly unfair rate division was demonstrated. On the other hand, the shippers' evidence of injury to them is not insubstantial, and the background of Kelly's acquisition of property —for the very purpose of obtaining, in lieu of team track service, a building with side track service—weighs against the plaintiff's equity for abandonment.

2. Plaintiff argues that the Commission should have permitted the re-opening of the case so that it could present more specific evidence in light of the Examiner's criticism of the generality and conclusory nature of the evidence that it had presented. The very generality of the motion presented (Exceptions of Applicant, etc. page 39) deprives it of much weight, and there is no clear indication that additional evidence could have altered. the controlling facts whether or not they answered to some extent the charge that the testimony presented was given in very general form. The basic and controlling facts emerge plainly enough, and the record appears sufficient to exclude the possibility that plaintiff's proofs could be decisively different on a new and expanded hearing. In any event such an application necessarily appeals to a discretion and it cannot be said that the Commission failed to exercise a reasonable discretion in denying relief on this score.

After the hearing had closed, the Hearing Examiner retired. Plaintiff argues, under 5 U.S.C. § 554(d), that it was error to permit the findings and recommended decision to be made, as they were, by an Examiner who had not heard the evidence. While there may be some doubt whether a hearing was required by the statute applicable to a proceeding under Section 1(18)–(20) of the Interstate Commerce Act, Brotherhood of Locomotive Engineers v. United States, N.D.Ohio 1963, 217 F.Supp. 98, 100; Braswell Motor Freight Lines Inc. v. United States, W.D.Tex.1967, 271 F. Supp. 906, 909, it is not necessary to decide that point. In the present case the language of Section 554(d) warranted the substitution of a new examiner. While the Section provides that the employee who heard the evidence "shall make the recommended decision or initial decision required by Section 557," it excepts the case where "he becomes unavailable to the agency." It is undisputed that retirement made the Examiner "unavailable to the Agency." The cases sanction the substitution of a new Examiner, or the bypassing of the Examiner's report in certain instances.

While the Act has been held to prescribe a procedural guarantee that the demeanor of witnesses, where material, be taken into account in the initial decision. Gamble-Skogmo, Inc. v. F.T.C., 8th Cir. 1954, 211 F.2d 106,[3] on the other hand the cases hold that substitution of hearing officers is permissible where the demeanor of witnesses is of little or no consequence. Art National Manufacturers Distributing Co. v. F.T.C., 2d Cir. 1962, 298 F.2d 476; 2 Davis, Administrative Law, §§ 11.18–11.19. In this case there was no material issue of credibility. The evidence about plaintiff's financial condition, the expenses in servicing track and the purported benefit from abandonment was given without contradiction. The protestants challenged its legal sufficiency rather than the truth of the testimony and protestants' witnesses testified only to the damages they might suffer if the abandonment was approved. The only disputed matters were collateral and largely irrelevant. Hence the fact-finding task of the Commission was to draw inferences from undisputed facts since it is the primary

---

3. This is not a constitutional requirement for due process, however, Utica Mutual Insurance Co. v. Vincent, 2d Cir. 1967, 375 F.2d 129, 131.

responsibility of the Agency and not the Examiner to find facts. The Commission can draw whatever inferences the facts permit. *Cf.* Utica Mutual Insurance Co. v. Vincent, 2d Cir. 1967, 375 F. 2d 129, 131–132.

 Plaintiff complains also that the Commission in reviewing the Examiner's recommended decision failed to comply with the requirement of 5 U.S.C. § 557(c) that "The record shall show the ruling on each finding, conclusion, or exception presented." This requirement may be satisfied without the Commission's making specific, separate rulings on each exception. The Commission's order of July 19, 1967, stated that, " * * * the exceptions of applicant raises [sic] * * * no new or material matters of fact and law not adequately considered and properly disposed of by the Hearing Examiner in his report; * * * that the said exceptions and replies, * * * are not of such a nature as to require the issuance by * * * Review Board of a report discussing the evidence in the light of the pleadings, and that applicant has advanced no sufficient reason for further hearing or oral argument." The order concluded its introductory portions with a finding that " * * * the evidence considered in the light of the exceptions and replies thereto does not warrant a result differing from that reached by the Hearing Examiner and * * * the statement of facts, and the conclusions and findings of the Hearing Examiner, being proper and correct in all material respects, should be, and they are hereby, affirmed and adopted * * *." The decision and order of Review Board No. 5 of the Commission did not discuss each exception and explain the ruling on each exception, but the order does rule on each exception and rules them insufficient. No further particularity is required. American President Lines v. N.L.R.B., 9th Cir. 1965, 340 F.2d 490, 492; North American Van Lines v. United States, N.D.Ind.1963, 217 F.Supp. 837, 842–843.

3. The plaintiff presents in this Court for the first time the contention that the Commission had no jurisdiction over the abandonment proceeding at all because Section 1(22) of the Interstate Commerce Act provides that the Commission's authority shall not extend "to the construction or abandonment of spur, industrial, team, switching, or side tracks, located * * * wholly within one State * * *."

 The very nature of plaintiff's railroad presents the question in a highly special form. As in the case of the somewhat similar Jay Street Connecting Railroad, plaintiff's railroad is in the main a congeries of spur, industrial, team, switching and side tracks. The abandonment of a side track, at least separately, might not be within the Commission's jurisdiction, see Meyers v. Jay Street Connecting R. R., 2d Cir. 1958, 259 F.2d 532, 535, but, as the same Court pointed out when the Jay Street Railroad was next before it in Meyers v. Jay Street Connecting R. R., 2d Cir. 1959, 262 F.2d 676, 678, since a railroad like plaintiff's is primarily made up of spur, industrial, team, switching and side tracks all located entirely within a single State, Subdivision (22) of Section 1 of the Act cannot be read to exclude from Commission jurisdiction all of the described kinds of track that are wholly within one state without reference to the way in which the track functions as part of the whole railroad, for so to read Subdivision (22) would manifestly authorize such a terminal railroad to abandon its entire railroad system without Interstate Commerce Commission sanction. Hence, in the *Jay Street* case the Court declined to permit an abandonment of "all spurs, side and team tracks" of the railroad, essentially on the ground that they and all of them might be impressed with functions beyond those normally ascribed to physically comparable track in other railroad systems, where, as in the case of the Jay Street Railroad (and in the case of the plaintiff), such track constitutes the entire terminal facility and the entire rail portion of the carrier's total service. It would seem clear from the facts that appear in the present

record that the Commission could properly conclude that it had jurisdiction of a proceeding to abandon the track in question.

The ultimate question of the presence or absence of Commission jurisdiction under Subdivision (22) of Section 1 of the Act is one that a federal court must decide for itself, and when the federal court reviews a Commission decision that considers its own jurisdiction under Subdivisions (18) and (22), the normal rule restricting the scope of court review of administrative determinations does not apply. Nevertheless, the cases appear to require that the Commission have an opportunity to pass on the jurisdictional question and to make findings on it before the issue is dealt with in the Courts. See United States v. State of Idaho, 1936, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070; City of Yonkers v. United States, 1944, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed. 400; cf. Western & Atlantic R. R. v. Georgia Public Service Commission, 1925, 267 U.S. 493, 497, 45 S.Ct. 409, 69 L.Ed. 753. The record made in the present case does not include any express findings on the issue: plaintiff invoked and no one denied that jurisdiction, and there was no evident occasion to rule explicitly. But the result is that the present record is not a fully satisfactory one for this Court to determine the Subdivision (22) question as a Court of first instance. The need for an investigation of the facts by the Commission and the benefit of its judgment on the issues of statutory interpretation and fact involved in the jurisdictional question are peculiarly relevant in the present case, where, on the record, the jurisdictional issue is entangled with the question whether the case did not involve a possibly discriminatory discontinuance of service. Cf. United States v. Baltimore & Ohio R. R., 1948, 333 U.S. 169, 68 S.Ct. 494, 92 L.Ed. 618; United States v. Wabash R. R., 1944, 321 U.S. 403, 406–407, 410– 411, 64 S.Ct. 752, 88 L.Ed. 827; Board of Public Utility Commissioners v. United States, D.N.J.1957, 158 F.Supp. 98; New York Central R. R. v. United States, S.D.N.Y.1962, 201 F.Supp. 958. See New Jersey v. New York S. & W. R. R., 1963, 372 U.S. 1, 5–6, 83 S.Ct. 614, 9 L.Ed.2d 541. At best the present proceeding appears to be a mistaken substitute for the kind of relief that might have been obtained by negotiation for a different division of rates or by application to the Commission, which has ample power to redress unbalanced divisions without increasing the total combined rate by establishing a joint rate for the through route and ordering a division. Cf. United States v. Great Northern Ry., 1952, 343 U.S. 562, 563– 564, 577, 72 S.Ct. 985, 96 L.Ed. 1142; Secretary of Agriculture of United States v. United States, 1954, 347 U.S. 645, 652, 74 S.Ct. 826, 98 L.Ed. 1015.

On the present record, therefore, no finding that the matter was not within the jurisdiction of the Interstate Commerce Commission can or should be made. Nothing that has been said is intended to indicate that plaintiffs are not free by new or further application to the Commission to seek appropriate relief, not excluding a fresh application to abandon track upon a proper showing.

It is concluded therefore, and it is

Ordered that plaintiff's application for an injunction vacating and setting aside the orders of the Interstate Commerce Commission dated July 19, 1967, November 7, 1967, and December 21, 1967, is denied, and the prayer that the proceeding be remanded to the Commission for granting of the application for abandonment on the present record or that the Commission be instructed to assign the proceeding for further hearing, is denied; and it is further

Ordered that the Clerk enter judgment that plaintiff take nothing and that the action is dismissed on the merits, without costs.