**FERACO, INC., Plaintiff,**

v.

**GEORGIA PACIFIC CORPORATION, Defendant.**

**Civ. A. No. 3399.**

United States District Court,
D. Delaware.

June 3, 1970.

Harold Shaffer, of Booker, Leshem, Green, Shaffer & Berl, Wilmington, Del., for plaintiff.

Andrew B. Kirkpatrick, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

OPINION

LAYTON, District Judge.

For the purposes of this argument, I accept the statement of facts in plaintiff's brief, which is as follows:

"In 1959, the defendant['s predecessor] selected plaintiff as the motor carrier for products to be shipped from defendant's new plant in Wilmington, Delaware. The plant was then under construction. When defendant selected Feraco for its service, plaintiff was a motor carrier operating on modest freight volume in the Philadelphia area. Because handling defendant's motor

freight would entail trebling of plaintiff's rolling stock and personnel, construction of motor freight terminal and repair facilities in Wilmington, and expansion of plaintiff's I.C.C. rights, plaintiff agreed to perform the service but only upon defendant's assurance it would use it as the sole motor carrier for the shipment of defendant's products from Wilmington. Furthermore, the parties recognized that plaintiff would be able to perform this service only if defendant aided plaintiff's efforts to acquire equipment and operating rights. Defendant lent such support. Specifically, (1) defendant made representations to third persons who extended credit to plaintiff for purchase of additional equipment required for the defendant's service; (2) defendant supported plaintiff before the I.C.C. where plaintiff applied for extended operating rights. Rights which coincided with defendant's markets were granted in consequence of defendant's support.

Thereafter, with unimportant exceptions, plaintiff was the sole carrier of gypsum products shipped by motor freight from the defendant's Wilmington plant from the time production commenced at that plant in 1961.

The parties still operated on this basis in the summer of 1966 when officials of Georgia Pacific (defendant's successor) called on Feraco's president in Wilmington. They told him they expected business to expand at the Wilmington plant. This growth, they said, would mean additional shipments by motor carrier. They asked for assurance that plaintiff would have available equipment sufficient to handle not only the present volume of business, but the anticipated increase as well. In response to those requests, and in the presence of Georgia Pacific officials, plaintiff's president immediately ordered tractors for defendant's service. These orders were subsequently embodied in tractor leases which required plaintiff to make minimum annual payments of $192,000 over a four-year period commencing in August 1966. In February of 1967, defendant sent plaintiff written notice summarily terminating plaintiff's motor freight service.

At all times pertinent to this litigation, plaintiff was a common carrier. Its I.C.C. operating rights—those that were commercially valuable—were obtained in consequence of defendant's sponsorship and tailored to defendant's convenience. Specifically, those rights permitted plaintiff to transport building materials from defendant's plant site in Wilmington to points throughout surrounding states.

As a common carrier, plaintiff was privileged to transport building material cargoes of other shippers. For obvious reasons, only an insignificant volume of building material cargo was delivered to plaintiff by other shippers for transportation from defendant's Wilmington plant. "Plaintiff was a one customer common carrier, for over ninety percent of plaintiff's business was with the defendant at defendant's plant."

Based upon the facts above recited, plaintiff claims damages upon either of two theories: (1) Breach by defendant of its contract to use plaintiff as its sole carrier by motor freight from its Wilmington plants; (2) The doctrine of promissory estoppel.

The defendant takes the position that any such contract as just described is invalid under 49 U.S.C. Sec. 301 et seq., the Motor Carrier Act of 1935, and that the doctrine of promissory estoppel is not operative under these facts.

■ The Motor Carrier Act representing an Act of Congress, federal law alone is applicable. Ex parte Worcester County Nat. Bank, 279 U.S. 347, 359, 49 S.Ct. 368, 73 L.Ed. 733 (1929).

■ Preliminarily, it may be said that the federal courts have uniformly[1]

---

1. Superficially contrary statements may be found in one or two cases but I do not deem them authoritative under the facts here. Interstate Commerce Commission v. Chicago G. W. Ry., 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705 (1908); Northern Pacific Ry. Co. v. St. Paul & Tacoma Lumber Co., 4 F.2d 359 (9th Cir. 1925).

interpreted the Railway and Motor Carrier Acts as prohibiting any variation from published rates as well as barring agreements by carriers or shippers which might lead to discrimination of any kind.

"The Interstate Commerce Act is one of the most comprehensive regulatory plans that Congress has ever undertaken. The first Act, and all amendments to it, have aimed at wiping out discriminations of all types." United States v. Baltimore & O.R.R., 333 U.S. 169, 175, 68 S.Ct. 494, 497, 92 L.Ed. 618 (1948).

"We have repeatedly said that it is apparent from the legislative history of the Act that not only was the evil of discrimination the principal thing aimed at, but that there is no basis for the contention that Congress intended to exempt any discriminatory action or practice of interstate carriers * * *." Mitchell v. United States, 313 U.S. 80, 94, 61 S.Ct. 873, 877, 85 L.Ed. 1201 (1941).

"Under the interstate commerce act, the rate of the carrier duty filed is the only lawful charge. Deviation from it is not permitted under any pretext. Shippers and travellers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases * * *." Louisville & Nash. R. R. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

■ Plaintiff's first point is that the oral agreement between it and defendant for the haulage of all defendant's freight from its Wilmington plant is a binding contract. This may be readily disposed of. As the holder of a certificate of common carriage, plaintiff was obligated to accept all freight offered to it for transportation at a fixed rate available to every shipper. It follows, then, that a contract by a shipper agreeing to designate a common carrier as its sole freight carrier, an obligation which plaintiff, as the holder of a certificate of common carriage, was bound to honor in any event, is wholly lacking in consideration and, thus, unenforceable. Chesapeake and O. Ry. v. Westinghouse, Church, Kerr & Co., Inc., 270 U.S. 260, 46 S.Ct. 220, 70 L.Ed. 576 (1926); [2] Chicago & Alton R. R. Co. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912).[3] See also, Metropolitan Convoy Corp. v. Chrysler Corp., 208 A.2d 519, 520, 521 (Supreme Ct.Del.1965).

■ It is doubtful if plaintiff seriously disputes this result. Its chief ground for recovery, I believe, is the doctrine of promissory estoppel. It takes the position that defendant, having persuaded it to undergo very substantial expense by way of leasing extra equipment in reliance upon defendant's promise to use it as its sole carrier for substantially increased freight, defendant's promise should be enforced under the estoppel doctrine and it is accordingly liable, at least to the extent of the out-of-pocket expenses plaintiff was put to. As to its duty as a common carrier, plaintiff argues that it is in a position to call on other shippers for emergencies to take care of unexpected shipments.

Nevertheless, for reasons hereinafter stated, I do not believe the doctrine of estoppel is applicable to facts such as these which arise out of dealings between parties subject to the Motor Carrier Act.

---

2. Shipper entered into a special agreement with carrier whereby carrier agreed to provide special facilities for spotting shipper's cars. Held that such a contract was discriminatory and without consideration because it was carrier's duty in any event to use its best facilities for spotting cars of every shipper.

3. Suit by shipper upon a contract by defendant railroad to expedite the shipment of race horses. Defendant's train failed to make connections and horses failed to arrive in time to participate in an important race.

It is difficult to conceive how plaintiff in equity and conscience can maintain that it changed its position to its detriment in reliance on a promise of additional business from defendant when under its certificate of common carriage, it had to accept any shipment this defendant, or any other shipper, chose to offer. In other words, as I view it, plaintiff is urging an estoppel based upon an agreement contrary to the policy underlying the Act.

In Bowser & Campbell v. Knox Glass, Inc., 390 F.2d 193, 194 (3d Cir. 1968), the Court was faced with the situation where a carrier mistakenly charged lower rates than those on file with the Commission. When this fact was discovered, the carrier promised the shipper it would not attempt to collect the difference betwen the mistakenly low rate charged and the actual rate which was on file with the I.C.C. In defiance of its agreement, the carrier thereafter sued for the undercharges. The carrier's agreement not to attempt to collect the balance was interposed as a defense. The Court, in permitting recovery, said this:

> "In the case of * * * the common and the contract carrier, the refusal to validate the economic distortion [difference between rate filed and rate actually charged] *by such doctrines as agreement, estoppel or unclean hands is a deterrent weapon in the enforcement of the statute and the public policy which underlies it.*" (Emphasis added.) 390 F.2d at 196.

In Artic Roofings, Inc. v. Travers, 3 Terry 293, 32 A.2d 559 (Del. Supreme Ct.1943), a shipper sought to defend an action by a carrier for a balance of rates allegedly due upon the ground that the carrier fraudulently induced it to ship by carrier's motor trucks under a schedule of rates which carrier well knew was incorrect. The Court, in denying recovery, stated inter alia:

> "The Act being primarily for the public good, the principles of estoppel will not defeat the carrier's rights, though he unintentionally misquoted the scheduled rate to the shipper before the delivery of the goods for transportation, *and material losses were caused thereby.* * * * Nor can there by any real distinction between a mere unintentional misrepresentation and a fraudulent misrepresentation by the carrier. * * * In either case, the usual common law rights of the individual shipper are subordinated to the statutory requirement of uniformity in rates; and while there may be cases of hardship, the general legislative policy, declared by the Act, controls. * * *" (Emphasis added.) 32 A.2d at 562.

See by way of analogy, China Fire Ins. Co. v. Davis, 50 F.2d 389, 392 (2d Cir. 1931); Louisville & Nash. R. R. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L. Ed. 853, supra.[4]

Moreover, arrangements of this sort may well form the basis of future discrimination by a carrier whose entire operation has been adjusted to a contract of the sort here in question. For instance, suppose Feraco with all its trucks assigned to a particular week's transportation scheduled by defendant is unexpectedly asked to accept a substantial shipment over one of its routes by some other shipper. Obviously, plaintiff would tend to accept the defendant's shipment at the expense of the other shipper.

All of which may be another way of questioning whether the plaintiff comes here with wholly clean hands. From the deposition of plaintiff's president, it is apparent that when plaintiff applied to the I.C.C. for a certificate of common

---

4. Plaintiff cites Metropolitan Convoy Corp. v. Chrysler Corp., supra, in support of its equitable estoppel argument. There, the Delaware Supreme Court seemed to assume without deciding that the estoppel doctrine was available to the plaintiff under very similar circumstances. The decision of that Court, however, was not upon the ground of promissory estoppel but on the fact that defendant had made no actual promise to plaintiff which caused the latter to change its position to its detriment.

carriage, it did so with its eyes open. Plaintiff knew the differences underlying a certificate of common carriage and of contract carriage. Despite the fact that the type of haulage contemplated by the agreement here under consideration corresponded much more closely with that of a contract carrier's certificate,[5] plaintiff, nevertheless, elected to apply for a certificate of common carriage. It may be supposed it had a good reason for this and it must accept the burdens along with the benefits accompanying the grant of such a certificate.

Under the circumstances, and in view of the policy underlying the Act, plaintiff, despite defendant's allegedly questionable conduct, is not in a position to recover here under the doctrine of estoppel.

Submit order.

5. "Plaintiff was a one customer common carrier, for over 90% of plaintiff's business was with the defendant at defend- ant's plant." (Statement of facts, plaintiff's brief.)