REO DISTRIBUTION SERVICES,
INC., Plaintiff,

v.

FISHER CONTROLS INTERNATIONAL,
INC., Defendant.

No. CIV. A. 90–0135–H.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Sept. 20, 1995.

David A. Penrod, Hoover, Penrod, Davenport & Crist, Harrisonburg, VA, Durene R. Hoyer, Christopher S. Smith, Hoyer, Hoyer and Smith, Charleston, WV, for Plaintiff.

David Z. Izakowitz, Edward R. Slaughter, Jr., Slaughter & Redinger, P.C., Charlottesville, VA, for Defendant.

*MEMORANDUM OPINION*

MICHAEL, District Judge.

The court referred this case to the Honorable B. Waugh Crigler, United States Magistrate Judge, pursuant to a standing order, for proposed findings of fact and a recommended disposition. The Magistrate Judge filed his Report and Recommendation on July 25, 1995, recommending that the court deny the defendant's May 19, 1995 renewed motion for summary judgment. The defendant filed Objections to the Magistrate's Report pursuant to Fed.R.Civ.P. 72(b). In considering the defendant's Objections, this court is required to undertake a *de novo* review of the record in this case. *Orpiano v. Johnson,* 687 F.2d 44, 47–8 (4th Cir.1982). After review of the record, the court adopts the recommendation of the Magistrate Judge and, accordingly, denies the defendant's renewed motion for summary judgment.

I.

In October, 1988, Reo Distribution Services (Reo) entered into an oral agreement with Fisher Controls International (Fisher) and Confederated Brokerage, Inc. to operate a warehouse and truck distribution center in Waynesboro, Virginia, for the purpose of distributing Fisher's control equipment. On November 1, 1988, two, two-year distribution contracts were signed—one between Fisher and Confederated, and the other between

Confederated and Reo.[1] The agreements authorized Reo to provide distribution services for Fisher's goods along the East Coast. Reo billed Fisher through Confederated. Both agreements were signed pursuant to Iowa law.

Reo began distributing Fisher's goods in October 1988. However, in February, 1989, with a year and a half left to run on the contract, Fisher effectively terminated the contract. Reo, in response, brought this breach of contract action in federal court, jurisdiction lying under 28 U.S.C. § 1332, alleging that the breach of the two-year contract resulted in $3.75 million in damages in the form of lost profits.[2] Fisher, in turn, filed a motion for summary judgment, arguing that the alleged contract is void and unenforceable because Reo, at the time the contract was consummated, did not have the authorities required under the Interstate Commerce Act (ICA) to legally perform its contractual obligations. *See* 49 U.S.C. § 10921.

In an effort to assess Fisher's argument, this court, in October, 1994, issued an order certifying several questions to the Interstate Commerce Commission (ICC). Specifically, the ICC was asked to determine whether the ICA required Reo to have had a license, permit, or certification to perform under the contract, and if so, whether Reo's lack of such certification would bar its claim for lost profits. On April 25, 1995, the ICC issued a decision stating that the services provided by Reo required a license and a permit, both of which Reo lacked at the time the written agreement was signed.[3] The ICC, however, held that the question of lost profits was an issue of contract law and, therefore, outside its jurisdiction. Accordingly, Fisher's motion for summary judgment returns to this court for final disposition.

There are two primary issues raised by Fisher's motion for summary judgment: (1) whether the contract between Reo and Fisher is void and unenforceable on the grounds that Reo did not have the proper authorities from the ICC at the time it entered into the contract; and (2) whether Reo may bring an action for lost profits.

## II.

The first issue is whether the contract between Fisher and Reo is enforceable despite the fact that Reo lacked licenses and permits required by the ICA to perform under the contract. The Iowa Supreme Court has held that contracts entered into by parties that lack permits necessary to engage in the contracting activity are unenforceable only if (1) the licensing statute expressly voids such contracts, or (2) enforcing such contracts would violate public policy. *See Davis, Brody, Wisniewski v. Barrett*, 253 Iowa 1178, 115 N.W.2d 839 (1962).[4]

Since the ICA does not expressly void contracts made in violation of its provisions,[5] the first condition articulated in *Barrett* is not met. Thus, the analysis shifts to wheth-

---

1. Fisher concedes for purposes of its motion that it entered into a contract or contracts with Reo. For purposes of analysis, the court refers to the two contracts as one contract, the alleged breach of which is at issue in this case.

2. Reo received payment for the distribution of products completed before the contract was terminated.

3. Reo applied to the ICC for authority to act as a motor common carrier, a motor contract carrier, and a broker on October 31, 1988, the day before the two written agreements were signed. The broker's license was served on February 27, 1989, and both the common carrier certificate and the contract carrier permit were served on March 7, 1989. *Fisher Controls Int'l, Inc. v. Reo Distribution Services, Inc.*, Interstate Commerce Commission Decision No. 41480, at 6 (April 25, 1995).

4. The court stated in *Barrett* that "[t]he general rule appears to be that a contract made in the course of a business or occupation for which a license is required by one who has not complied with such requirement is unenforceable where the statute expressly so provides, or where it expressly or impliedly, as a police regulation, prohibits the conduct of such business without compliance." 115 N.W.2d at 841.

5. The ICC held in this case that "[a]lthough the ICA provides for penalties against those who conduct operations without ICC authority, the Act does not provide a mechanism for voiding agreements entered into by private parties. The validity of the contract is not a matter of regulatory law but of contract law." *Fisher Controls Int'l v. Reo Distribution Services, Inc.*, ICC Decision No: 41480 at 6–7 (April 24, 1995).

er the contract is unenforceable as violative of public policy.

Reo cites *Ets–Hokin and Galvan, Inc. v. Maas Transport, Inc.*, 380 F.2d 258 (8th Cir.1967), *cert. denied*, 389 U.S. 977, 88 S.Ct. 481, 19 L.Ed.2d 471 (1967), for the proposition that the contract is enforceable despite the fact that Reo did not have the requisite authorities when it signed the contract with Fisher. In *Ets–Hokin*, the Eighth Circuit refused to void a contract involving the interstate shipment of a product by a shipper who failed to file a tariff with the ICC as required under the ICA. The shipper eventually filed a tariff but the tariff did not become effective until two months after the shipper began executing the contract. *Ets–Hokin*, 380 F.2d at 260 n. 3. The court held the contract enforceable, stating in pertinent part that:

> A contract in violation of a statutory provision is generally void or illegal only if the legislative body enacting the statute evidences an intention that such contracts be considered void or illegal. Otherwise, even though the parties to a contract may be subject to a statutory penalty as the result of performing a contract, the contract itself remains in full force and effect. In the instant case, Maas was in violation of the Motor Carrier provisions of the Interstate Commerce Act when it transported cable under its contract with Ets–Hokin and was subject to penalties for such violations. The cable transportation contract itself, however, would be void, illegal or unenforceable only if Congress, in passing the Motor Carrier provisions of the Interstate Commerce Act, intended that contracts resulting in violations of that portion of the Act be illegal and void. A review of the statutory provisions involved herein reveals no congressional intention to make contracts in violation thereof void or ille-

gal. The contract between Ets–Hokin and Maas was valid and enforceable.

380 F.2d at 260–261 (internal citations and footnotes omitted). Reo maintains that *Ets–Hokin* is directly on point and is, therefore, highly persuasive authority. The court agrees. The holding in *Ets–Hokin* that a contract is enforceable despite underlying violations of the ICA clearly suggests that enforcement of the contract at issue here would not violate public policy. Like the contract at issue in *Ets–Hokin*, the underlying purpose of this contract is not in any way illegal. Moreover, there are already sufficient regulatory mechanisms in place to ensure compliance with the ICA's licensing provisions. Thus, voiding the contract here would be a remedy vastly disproportionate to its deterrent effect.

Fisher protests that the *Ets–Hokin* court did not apply Iowa law and is, therefore, irrelevant to the issue of whether enforcing the contract would violate the public policy of Iowa. Rather, *Ets–Hokin* rested primarily on federal law. However, Fisher is asking the wrong question. The issue is not so much whether enforcing the contract would violate Iowa public policy, but whether doing so would violate U.S. public policy since the contract at issue is premised upon a violation of a *federal* statute. In other words, if federal interests are not compromised by the court's enforcing this contract, it is difficult to see how Iowa's interests are so compromised. *Ets–Hokin* stands for the proposition that federal interests are not compromised when courts enforce contracts that are premised upon violations of the ICA—Congress simply did not express a desire to void such contracts. Thus, it is difficult to maintain that enforcing such contracts would violate the public policy of Iowa.[6] Indeed, voiding

---

**6.** Fisher, in an apparent concession on this point, cites *Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc.*, 988 F.2d 288 (1st Cir.1993) in arguing that enforcing the contract at issue here would harm federal interests and should, therefore, not be -enforced by this court. In that case, the First Circuit held that, under federal law, a contract entered into by an unlicensed broker under the ICA was unenforceable. Relevant to the court's holding in *Paul Arpin*, however, was the fact that the plaintiff never attempted to get the proper licenses despite

knowledge that he needed a license to perform under the contract. Rather, he simply misrepresented his status without trying to abide by the regulations. Indeed, he performed under the contract for over a year without the proper authorities. The court noted:

> Although there is no indication that McGowan was either fraudulent or incompetent, his failure to obtain a broker's license cannot be ignored or forgiven. There is no point in speculating why McGowan did not obtain a license.

the contract could raise federalism concerns to the extent federal law mandates the enforcement of such contracts.[7]

Fisher also attempts factually to distinguish *Ets–Hokin*. It argues that *Ets–Hokin* involved an action to recover actual damages rather than lost profits. This argument, however, does not suggest that the contract is unenforceable. It simply seeks to set parameters for that enforcement by limiting recovery to actual damages. In addition, Fisher argues that the parties in *Ets–Hokin* believed that the contract involved intrastate transportation of goods and that the shipper had an appropriate license for such activity. This is not an adequate grounds for distinguishing *Ets–Hokin* since Reo, like the shipper in *Ets–Hokin*, was acting in good faith.

Finally, Fisher argues that *Ets–Hokin* is undermined by the U.S. Supreme Court decision in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court in *Maislin* invalidated an ICC policy that relieved shippers of the obligation of paying the "filed rate"[8] when the shipper and carrier have privately negotiated a lower rate because the policy contradicted the express provisions of the ICA. Fisher wisely concedes that the case is "not relevant to a determination of whether the contract is enforceable," *Defendant's Support Memorandum* at 27 n. 5, since it did not involve a defense of illegali-

ty. Rather, Fisher argues that *Maislin* mandates strict adherence to the requirements of the ICA.

*Maislin*, however, is narrowly focussed on the rate requirements of the ICA. The opinion suggests that the provisions governing rates are of particular significance because they serve as a prophylactic against antitrust violations. The Court stated that the "duty to file rates with the Commission and the obligation to charge only those rates have always been considered essential to preventing price discrimination and stabilizing rates. 'In order to render rates definite and certain, and to prevent discrimination and other abuses, the statute require[s] the filing and publishing of tariffs specifying the rates adopted by the carrier, and ma[kes] these the legal rates, that is, those which must be charged to all shippers alike.'" *Maislin*, 497 U.S. at 126, 110 S.Ct. at 2765 *(quoting Arizona Grocery Co. v. Atchison, T. & S.F.R. Co.*, 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348 (1932))*.

Thus, *Maislin* cannot be read as broadly as Fisher suggests. Indeed, in *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982), the Supreme Court held in a breach of contract case that an affirmative defense, based upon a shipper's violation of the ICC's credit regulations, was not available, and the breach of contract action was,

---

The record evinces that he had worked in the field of transportation of household goods for many years. It can, therefore, be fairly inferred that McGowan knew of the ICC broker's licensing requirement. There was also record evidence from which it could be found that McGowan, in answer to a direct question, stated he had an ICC's broker's license. This was a knowing misrepresentation. . . .
*Paul Arpin*, 988 F.2d at 291.
  The facts of the present action are clearly distinguishable. Reo applied for the requisite authorities before it signed the contract with Fisher. And it received them from the ICC with one-and-a-half years left to run on a two year contract. Further, although the contract does state that Reo was duly licensed as a contract carrier, it is alleged that Fisher knew Reo lacked the authorities when it signed the contract. *Plaintiff's Response to Objections* at 13. Thus, the issue of misrepresentation is not as clearly presented as it was in *Paul Arpin*. In short, *Ets–Hokin* is more on point than is *Paul Arpin*. Moreover, this court prefers to follow Eighth

Circuit precedent on this issue rather than First Circuit precedent because Iowa lies within the Eighth Circuit's jurisdiction. *Cf. Isaac v. Life Investors Ins. Co. of America*, 749 F.Supp. 855, 863 (E.D.Tenn.1990) (stating in course of interpreting federal change of venue statute, 28 U.S.C. § 1404(a), that "while the law of the transferor forum on federal issues merits close consideration, it is not binding upon the transferee forum").

7. Congressional silence with respect to courts' authority to void contracts made in violation of the ICA's licensing provisions could denote a Congressional directive requiring enforcement of such contracts. *See* discussion of *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982) at page 8, *infra*.

8. The ICA requires that common carriers file their rates with the ICC and not deviate from those rates. 49 U.S.C. §§ 10761, 10762.

therefore, maintainable despite the violation, because Congress had not explicitly provided for such a defense. The Court stated as follows:

'legislative silence is not always the result of lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation.... Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.' We so regard the administrative silence here. When an administrative agency historically has engaged in comprehensive regulation of an industry's credit practices, the agency's silence regarding an affirmative defense based on a violation of those regulations must be deemed significant.

*Southern Pacific,* 456 U.S. at 345, 102 S.Ct. at 1821 (quoting *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980)).

Thus, the Court rejected the argument that faithful adherence to the regulatory framework demanded the availability of an affirmative defense, in a breach of contract case, premised upon a shipper's violation of a regulatory directive.

Despite the authority of *Ets–Hokin* and *Southern Pacific,* Fisher adamantly maintains that the contract is clearly unenforceable as violative of public policy. Specifically, Fisher cites Corpus Juris Secundum for the proposition that "a contract entered into by a person in the course of an occupation or business in which he is engaged without taking out a license as required by law is void, illegal and unenforceable, where the statute or ordinance is of a regulatory nature enacted to protect the public." 53 C.J.S. *Licenses* § 74 (1987). Fisher argues that Iowa has adopted this rule. *See Walker v. American Family Mutual Ins. Co.,* 340 N.W.2d 599, 601 (Iowa 1983).

9. Again, this court is perplexed as to how the enforcement of the contract here could possibly violate the public policy of Iowa if it does not violate *federal* public policy. For the sake of completeness, however, the court indulges this possibility.

10. In a similar vein (albeit without a licensing component), the Supreme Court of Iowa enforced a lease for equipment even though the

Since it is clear, Fisher argues, that the ICA is a regulatory statute, enacted to promote public safety, it follows *a fortiori* that a contract signed without the requisite permits and licenses is unenforceable as violative of Iowa public policy.[9]

However, in the recent case of *Water Development Company v. Lankford,* 506 N.W.2d 763 (Iowa 1993), the Supreme Court of Iowa enforced a water supply contract even though the water company failed to obtain the required permits for its water mains from the appropriate state agency. The court's holding appears to reject the proposition that a contract entered into without the proper license is unenforceable if the licensing statute states or implies that the conduct at issue is prohibited without the license. Indeed, the court articulated a different test for determining whether contracts entered into without the proper licenses are enforceable in the absence of explicit statutory language voiding them:

The fact a statute provides an administrative or criminal penalty for its violation is not the test for determining contractual rights of parties to a transaction involving some form of illegality. The degree of the illegal factor, extent of public harm that may be involved, and moral quality of the conduct of the parties in light of prevailing mores and standards of the community are influential factors in determining whether some judicial remedy will be granted.

*Lankford,* 506 N.W.2d at 766 (citing *Beneficial Finance Co. v. Lamos,* 179 N.W.2d 573, 580 (Iowa 1970) (citing 6A *Corbin on Contracts* § 1534 (1962))).

Thus, the court balanced various factors in determining whether to enforce a contract entered into without the appropriate licenses.[10] In this case, a proper balancing re-

lease was not in writing as required by an Iowa statute. The court stated that

a plaintiff who has performed under the illegal bargain may recover if the statute is merely *malum prohibitum* and the denial of relief is wholly out or proportion to the requirements of public policy or appropriate individual punishment.... The commerce commission regulations are indeed a part of the law of the land and must be obeyed.... But we are unwilling

quires enforcing the contract. Reo acted in good faith by applying for the permits before signing the written contract. Indeed, Reo alleges that Fisher knew Reo was still in the application process when the contract was consummated.[11] Moreover, Reo in no way attempted to avoid the requirements of the ICA. It received its permits in February and March of 1989, four to five months after signing the contract. Thus, Reo was poised to fulfill its obligations under the contract for the remainder of the life of the contract. Fisher, in contrast, is alleged to have acted in bad faith by manufacturing the licensing issue as a pretext for discharging its responsibilities under the contract. In short, Reo did everything required of it except have the actual licenses on-hand when it began distributing Fisher's products. Both the degree of this illegal factor and the extent of public harm caused by it are negligible, while the equities clearly favor enforcement of the contract. The court is not concerned that enforcement of the contract will undermine compliance with the ICA's licensing provisions given the significant incentives created by the ICA's penalty provisions for compliance. Indeed, an opposite result could influence manufacturers to encourage its carriers to sign contracts without the proper authorities so as to have an "out" should the manufacturers wish to breach the contract sometime in the future.

In the interest of completeness, the court briefly discusses two of Fisher's remaining arguments in support of its proposition that the contract is unenforceable. First, Fisher cites a number of "filing rate" cases. In such cases, courts have refused to award "common carriers" the difference between the agreed upon rate and the higher rate "filed" by the carrier with the ICC on the grounds that the carrier contracted beyond the scope of its permit.[12] See e.g., Nyad Motor Freight, Inc. v. W.T. Grant Co., 350 F.Supp. 692 (S.D.N.Y. 1972), aff'd in part and re'd in part, 486 F.2d 1112 (2d Cir.1973);[13] Mars Express, Inc. v. David Masnik, Inc., 401 F.2d 891 (2d Cir. 1968); Metropolitan Convoy Corp. v. Chrysler Corp., 58 Del. 286, 208 A.2d 519 (Super.Ct.1965); Feraco, Inc. v. Georgia Pacific Corp., 313 F.Supp. 660 (D.Del.1970). These filing rate cases, however, do not support Fisher's argument since they do not hold that the contracts were void and unenforceable. To the contrary, they hold that the common carriers can receive the contracted rate. In any event, since Reo is a contract carrier[14] that is not making a claim for a higher filing rate, these cases are of limited significance. Moreover, at least one of the cases cited by Fisher relied upon the fact that common carriers have to supply services to all shippers that ask—they enjoy no right to require specific shippers to employ them. Thus, common carriers generally cannot bring breach of contract claims against shippers. See, e.g., Feraco Inc. v. Georgia Pac. Corp., 313 F.Supp. 660, 662 (D.Del.1970) ("a contract by a shipper agreeing to designate a common carrier as its sole freight carrier, an obligation which plaintiff, as the holder of a certificate of common carriage was bound to honor in any event, is wholly lacking in consideration and, thus, unenforceable"). Obviously, Reo, as a "contract carrier", can enter

to deny recovery under the circumstances shown here simply because the lease was not in writing.
*Fuchs v. Rose*, 186 N.W.2d 621, 625 (Iowa 1971).

**11.** Reo asserts that Fisher's knowledge of the status of Reo's permit applications precludes Fisher from raising its illegality defense. The court does not reach this issue given its denial of Fisher's motion.

**12.** The ICA requires that *"common* carriers" file their rates with the ICC and not deviate from those rates. Since 1983, the ICC has exempted *"contract* carriers" from the requirements of the filed rate doctrine. *See Atlantis Exp., Inc. v. Standard Transp. Services*, 955 F.2d 529, 533 (8th Cir.1992).

**13.** Fisher's reliance on *Nyad Motor Freight, Inc. v. W.T. Grant Co.*, 350 F.Supp. 692 (S.D.N.Y. 1972), *aff'd in part and rev'd in part*, 486 F.2d 1112 (2d Cir.1973) is misplaced since that case is no longer good law. In that case, a contract carrier sued for the difference between the filed rate and the charged rate. As noted at n. 12, *supra*, contract carriers no longer need to file their rates with the ICC.

**14.** The ICC determined that Reo was engaged as a "contract carrier." *See Fisher Controls Int'l v. Reo Distribution Services, Inc.*, ICC Decision No. 41480 at 4 (April 24, 1995).

into binding contracts with shippers and can, consequently, seek damages for breach of contract.

Second, Fisher cites *Empire Box Corp. v. Willard Sulzberger Motor Co.*, 104 F.Supp. 762 (D.N.J.1952), for its assertion that a violation of the ICA results in an illegal, unenforceable contract.[15] However, *Empire Box* is factually distinguishable. In *Empire Box,* the court held that a contract was unenforceable because the shipper did not have the proper ICC license. The *Empire Box* court found that the unlicensed shipper had intentionally intended to evade the requirements of the ICA. Indeed, the court found that the agreement in that case was "nothing more than a subterfuge designed to disguise the true nature of the operations [under the contract] and thus evade regulation under the [Interstate Commerce] Act." *Empire Box,* 104 F.Supp. 762, 765. In this case, Reo did not intend to evade the ICA since it applied for the proper ICC authority *before* signing the written agreement with Confederated. Thus, *Empire Box* is of limited significance here.[16]

In short, public policy does not require this court to void the contract at issue here. Both federal law and Iowa state law support this conclusion. Fisher's various arguments to the contrary do not withstand scrutiny.

## III.

■ The second issue raised by Fisher's motion for summary judgment is whether Reo can recover for lost profits as opposed to simply actual damages. Specifically, Fisher contends that even if the contract is enforceable, Reo cannot seek damages for lost profits given the underlying violation of the ICA.

Fisher asserts that motor carriers who provide services in violation of the ICA may, at best, only recover on a quantum meruit or quasi-contract basis for the value of the services actually rendered. Fisher cites *Mountain States Bolt, Nut & Screw Co. v. Best Way Transp.*, 116 Ariz. 123, 568 P.2d 430 (Ct.App.1977) for this proposition.[17] However, there is no indication that the plaintiff in that case sought lost profits. Indeed, the issue of lost profits is not addressed.[18]

15. Fisher also cites *Pound v. Brown*, 258 Iowa 994, 140 N.W.2d 183 (1966). This reliance is misplaced. In *Pound,* the Supreme Court of Iowa interpreted the brokerage licensing statute at issue as voiding any contacts made in violation of its provisions. Since the ICA has not been interpreted by the ICC as containing such a provision, *Pound* is inapposite.

16. In a final thrust, Fisher argues that in *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947) the Supreme Court declared that courts cannot enforce a contract if doing so would result in consummation of a violation of a statute. However, the exact language the Court used is much narrower than Fisher suggests. Specifically, the Court held that "where a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute." *Bruce's Juices,* 330 U.S. at 755, 67 S.Ct. at 1020. The discussion in *Bruce's Juices* cited by Fisher has no relevance to the instant action since this is not a case wherein the contract "has as its object and effect accomplishment of illegal ends." *Id.* Reo and Fisher had as their objective, the distribution of Fisher's products—an entirely legal purpose. Moreover, the *Bruce's Juices* Court held that a sales contract was enforceable despite the fact that the seller engaged in illegal

price discrimination against the buyer. Thus, the holding of the case actually undermines Fisher's argument.

17. Fisher also cites *Pound v. Brown*, 258 Iowa 994, 140 N.W.2d 183, 186 (1966), for its assertion. As discussed at n. 15, *supra, Pound* is inapposite. Moreover, the case did not draw a distinction between actual damages and lost profits.

18. Interestingly, the court in *Mountain States Bolt, Nut & Screw Co* held that the trucking contract at issue was enforceable despite the trucker's failure to secure a certificate as required under state law. The court stated that the general rule holding that a contract which violates a statutory provision is void "is not inflexible" and could not be invoked to void a contract consummated for the legal purpose of transporting goods. *Mountain States Bolt, Nut & Screw Co.*, 568 P.2d at 431. In reaching its conclusion, the court noted that:

> While it is true that our Legislature has required proper certificates and has provided that carrier operation without proper certificate is a misdemeanor, we are not persuaded that in so doing the Legislature has declared contracts of this nature so violative of public policy as to be unenforceable. It is significant that in considering similar federal carrier licensing requirements, federal authorities have

A case more on point is *City of Lawrence v. Falzarano,* 380 Mass. 18, 402 N.E.2d 1017 (1980). In that case, the Supreme Judicial Court of Massachusetts upheld an arbitrator's award of lost profits in a breach of contract action brought by a contractor against a municipality. The municipality argued that the contract was unenforceable because the contractor had not complied with various state statutory provisions regarding the issuance of certificates. After concluding that "many contracts cannot lawfully be performed without securing a permit, license, or approval from some governmental officer or board, and yet the contracts are not deemed illegal," *id.* at 1021 (citing Williston, *Contracts* § 1767 (3d ed.1972)), the court upheld the award of lost profits on the grounds that the award was not "contrary to legislative or other public policy." *Id.* at 1024.

 Ultimately, Fisher argues that the cases upon which Reo relies for its argument that the contract is enforceable, such as *Ets–Hokin,* were cases in which a court awarded only actual damages; that is, compensation for services already performed. The cases did not explicitly sanction the award of lost profits. Of course, those cases did not explicitly rule out the possibility of awarding lost profits either. It is difficult to discern why Reo should not be allowed damages for lost profits given that the contract is enforceable. Indeed, it appears to follow *a fortiori* from the fact that the contract is enforceable that Reo may seek damages for lost profits, especially since Iowa law allows for the recovery of lost profits in breach of contract cases as long as those lost profits are not speculative. *See King Features Syndicate v. Courrier,* 241 Iowa 870, 43 N.W.2d 718 (1950). Moreover, in the *Lankford* case, 506 N.W.2d 763 (Iowa 1993), discussed above, the Supreme Court of Iowa upheld a monetary award for the water company that represented the value of the thirty-seven remaining years on its contract even though the water company did not have all the requisite permits necessary to supply water to the defendant.

In short, Reo may seek damages for lost profits as long as it can quantify them.

## IV.

The Interstate Commerce Commission held in this case that the Interstate Commerce Act does not expressly void contracts made in violation of the Act's licensing provisions. Nor do public policy concerns demand that the court void the contract at issue here. Thus, the court declines Fisher's invitation to hold unenforceable its contract with Reo on the grounds that the contract is illegal. Instead, Reo may prosecute its claim against Fisher and seek appropriate relief, including non-speculative lost profits. An appropriate Order will this day issue.

---

permitted carriers operating beyond the scope of their licenses to recover the reasonable value of services rendered in accordance with established tariff rates.

*Id.* at 431–432 (citing *Shannon Spring Bed Mfg. Co. v. North American Van Lines, Inc.,* 61 M.C.C. 73 (1952)).