# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 3, 2010 Session

## CHRISTENBERRY TRUCKING & FARM, INC. v. F&M MARKETING SERVICES, INC.

**Appeal from the Chancery Court for Knox County**
**No. 165464-1     John F. Weaver, Chancellor**

---

**No. E2009-01325-COA-R3-CV - FILED MARCH 31, 2010**

---

Christenberry Trucking & Farm, Inc., initiated this litigation against F&M Marketing Services, Inc., with a complaint seeking a declaration that Christenberry had not contracted to pay F&M a commission on loads Christenberry hauled for UPS/Dell Computer ("the UPS/Dell account"). F&M filed an answer and counterclaim asking for a determination that there was a contract with respect to the UPS/Dell account under which Christenberry was obligated to pay F&M a commission of 6%. F&M's counterclaim also asked for an accounting and attorney's fees. The case was tried without a jury, after which Christenberry was allowed to amend its pleadings to allege that if there was a contract it was illegal and unenforceable because F&M is not licensed as a broker by the Interstate Commerce Commission ("the ICC"). The trial court found that there was a contract between Christenberry and F&M, but that the contract was rendered illegal and unenforceable because of F&M's lack of a broker's license. F&M hired new counsel who filed a notice of appeal that did not contain the signature of its trial counsel. Christenberry filed a motion with the trial court to strike the notice of appeal. Six days later, F&M filed an amended notice of appeal which bore, in addition to the signature of its new appellate counsel, the signature of its counsel of record in the trial court. F&M argues on appeal that it was not required to be licensed and, alternatively, that the contract should not be nullified for its lack of a license, even if one was required. Christenberry argues that the notice of appeal is ineffective. We vacate the judgment of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated; Case Remanded**

CHARLES D. SUSANO, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS,

P.J., and JOHN W. MCCLARTY, J., joined.

Henry E. Seaton and Jere R. Lee, Nashville, Tennessee, for the appellant, F&M Marketing Services, Inc.

David L. Buuck, Knoxville, Tennessee, for the appellee, Christenberry Trucking & Farm, Inc.

Donald K. Vowell, Knoxville, Tennessee, for amicus curiae, The National Association of Small Trucking Companies.

**OPINION**

I.

The only signed contract between the parties is a "Commission Sales Agreement" dated October 2, 2003. It describes Christenberry as "a motor carrier operating in interstate and/or intrastate commerce pursuant to operating authority issued to it by the Interstate Commerce Commission and/or other appropriate commissions MC 208052." It refers to Christenberry as "CARRIER" and F&M as "AGENT" without elaboration as to the meaning of these terms. The core of the agreement is as follows: "Commissions shall be paid at 2-1/2% for shippers brought to CARRIER by AGENT." However, a handwritten addition to the agreement labels it "Account Specific: Americold Logistics/Ashland City, TN."

UPS is a licensed freight broker[1] that arranges shipping for Dell Computers, among others. Prior to the events at issue, Christenberry hauled some loads under contract with UPS, but had no ongoing relationship. F&M had been working with UPS since 2001 to secure haulers for the UPS/Dell account. In early 2004, F&M contacted Christenberry inquiring regarding Christenberry's interest. After some phone calls and discussions, F&M relayed an offer from Christenberry to haul the UPS/Dell freight from Nashville and Lebanon, Tennessee, to Harrisburg, Pennsylvania, at the rate of $1,170 per load. The figure consisted of $1,100 for the haul bill quoted by Christenberry plus $70 commission added by F&M. UPS approved the rate, and F&M only then disclosed the identity of UPS to Christenberry and vice versa. On February 20, 2004, F&M faxed Christenberry a copy of the Americold Commission Sales Agreement, which included a hand-written addendum for the UPS/Dell account with a request that Christenberry initial the document and fax it back. The addendum included a commission rate of 6% for the UPS/Dell account. Christenberry never initialed or signed the addendum.

---

[1]The term "broker" is a term of art to be discussed in detail later in this opinion.

Christenberry did, within days, tell F&M that it needed a higher rate for the haul. F&M negotiated a rate of approximately $100 more per load. Between February and May, F&M attended meetings and communicated by email and telephone as a liaison between UPS and Christenberry to complete all preliminary requirements. Christenberry began hauling freight on the UPS/Dell account in May 2004. Under the Commission Sales Agreement, Christenberry is responsible for sending commission reports to F&M which the latter uses to invoice Christenberry. Between May 2004 and September 2005, F&M submitted invoices on the UPS/Dell account which Christenberry paid in 44 separate checks. In early September 2005, Christenberry asked F&M to secure a higher rate on the UPS/Dell account. The arrangement broke down in the late 2005 time frame when Christenberry began to protest that it did not have a contract with F&M. Christenberry refused to pay several pending F&M invoices. This lawsuit is the culmination of the dispute.

In its memorandum opinion filed after a two-day trial, the court determined that the evidence "overwhelmingly" proved a contract between Christenberry and F&M on the UPS/Dell account, one requiring Christenberry to pay a 6% commission. Since neither party challenges that finding, we have included only the evidence and discussion related to the contract that is necessary to understand whether F&M was acting as a broker when it brought Christenberry and UPS together.

After the trial concluded, but before the court filed its memorandum opinion, Christenberry filed a motion to have its pleadings amended to conform to the proof. The trial court granted the motion upon finding "that Christenberry established that the issue[] of whether the contract between the parties is unenforceable based upon public policy due to F&M Marketing's failure to have a broker's license . . . [was] tried by either express or implied consent of the parties." As part of its order allowing the amendment, the court accepted the following facts as proven by stipulation of the parties:

> (1) If there was a contract between the parties in this matter, then F&M Marketing operated by authority from Christenberry; (2) agents do not arrange the transportation of freight; (3) agents are not responsible for the scheduling of freight or the carriers who carry freight; (4) agents do not collect payment for the transportation of freight; (5) agents do not set the pricing of freight; (6) F&M negotiated pricing but did not set the final pricing; (7) F&M Marketing did not have the power to assign loads on a day-to-day load basis; (8) Christenberry made the final decision as to whether it wanted to take UPS loads or not.

F&M does not have a broker's license. It characterizes itself as follows:

> What we are is not a broker. We are a group of agents. . . . We believe that we are unique in the industry in that we have 15 to 20 agents that operate under the auspices of F&M Marketing.

The "agents" maintain contact with carriers and shippers. F&M does business with hundreds of shippers. With regard to a given shipper, F&M tries to "find out what their needs are for a carrier." With regard to a carrier, F&M tries "to find freight for them that will meet their needs." Thus, according to F&M, they are in the business of making "matches between shippers and carriers for long-term relationships, not for spot loads here and there like a broker does." F&M has contracts with approximately 250 carriers. With regard to the UPS/Dell account, F&M, through Janice Peulausk Hadaway, contacted almost every licensed carrier in the vicinity of Knoxville. If Christenberry had rejected or terminated the UPS/Dell account, F&M would have solicited other carriers. Mike Hadaway, president of F&M, admitted on cross-examination, that his job "is to arrange the transportation of goods or property or whatever by an authorized motor carrier."

The trial court found that F&M is a "'broker' within the meaning of the Interstate Commerce Act." The court employed the following analysis:

> A broker is a person who, for compensation and as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for transportation by a motor carrier. 49 U.S.C.S. § 13102 (2)(2006).
>
> UPS approached F&M's agent about assisting UPS in locating carriers for UPS's Dell account. . . . "After an intensive search, F&M's agent []found that Christenberry was interested in hauling freight for the UPS/Dell account." . . .
>
> F&M asserts that at the time Ms. Hadaway provided the carrier's price to UPS/Dell, she was acting as the carrier's agent as contemplated by 49 C.F.R. § 386.2. F&M asserts that all Ms. Hadaway did was disclose the identity of UPS/Dell to the carrier and the carrier to UPS/Dell which does not constitute selling, offering for sale, providing, arranging or offering to arrange the transportation of property as contemplated by 49 U.S.C. 13102 and 49 C.F.R. 386.2. F &M argues that the facilitator has to

-4-

have a contract with the shipper in order to be considered a broker. However, the statutory definition of broker does not make such a distinction. Broker "means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier." 49 U.S.C.S. § 13102.

A person may be a broker for transportation subject to jurisdiction under subchapter I of 49 U.S.C.S. §§ 13501 et seq. only if the person is registered under 49 U.S.C.S. §§ 13901 et seq. to provide the transportation or service. To operate as a freight broker, a business or individual must obtain a license from the Federal Motor Carrier Safety Administration (FMCSA)[2]. Brokers must register with the FMCSA by filing the OP-1 Application for Motor Property Carrier and Broker Authority. After the MC Number has been assigned, brokers must also file proof of insurance coverage to complete the application process.

\* \* \*

If not a broker, F&M may be an agent. The Commission Sales Agreement consistently refers to F&M as an agent. However, F&M does not seem to fit the definition of agent:

> Bona fide agents are persons who are part of the normal organization of a motor carrier and perform duties under the carrier's directions pursuant to a preexisting agreement which provides for a continuing relationship, precluding the exercise of discretion on the part of the agent in allocating traffic between the carrier and others.

49 U.S.C. § 10102(7). In *Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc.* a corporation was held to be [a] broker and not an agent of the plaintiff moving company. 988 F.2d 288 (1st Cir. 1993). The First Circuit

---

[2]FMSCA is the new name of the agency that encompasses the ICC.

concluded that even though the contract carefully avoided the use of the word "broker," a "non-exclusive sale agent" who is "an independent contractor" can only be a broker as defined in the regulations. *Id*. at 292. What one labels oneself does not determine one's status. *See, e.g.*, *id.*; *cf. Phoenix Assurance Co. v. K-Mart Corp.*, 977 F. Supp. 319, 326 (D. N.J. 1997)(registration as broker and failure to register as carrier does not determine status). Status should instead be determined by the nature of the relationship. *See Phoenix Assurance Co.*, 977 F. Supp. at 326. The nature of the relationship appears to be one of broker and carrier between the trucking company and F&M.

F&M represents hundreds of carriers and shippers and was not a part of the normal organization of the carrier in this case. In relation to the UPS/Dell account, Ms. Hadaway contacted many carriers in Knoxville in order to find someone to carry the UPS/Dell freight. F &M then brought multiple carriers to UPS.

(Footnote added; quotations, capitalization and empty brackets in original.) Having concluded that F&M is a broker operating without a license, the court found the contract to be in violation of public policy and unenforceable; the court relied upon *Paul Arpin Van Lines, Inc. v. Universal Services, Inc.*, 988 F.2d 288, 291 (1st Cir. 1993), and *Shirley v. State*, 280 S.W.2d 915, 916 (Tenn. 1955). The court also concluded that a quantum meruit recovery is precluded in such a situation. Accordingly, in its memorandum opinion, the court stated that

[t]his court declines to award either party anything under the contract or for services rendered. The parties shall be left as they were before the Complaint for Declaratory Relief was filed. The Court will enter an order dismissing the complaint, as amended, as well as the counter complaint. . . .

The court entered a simple one-paragraph order on May 21, 2009, giving effect to its memorandum opinion.

F&M, by attorney Timothy Mickel of Chattanooga, filed a notice of appeal in the trial court on June 19, 2009. That notice did not bear the signature of its trial counsel. On July 27, 2009, Christenberry filed a motion to strike the notice of appeal for lack of its signature of attorney of record. On August 4, 2009, trial counsel, Gregory McMillan, added his

signature to the previously-filed notice and gave notice to opposing counsel of the addition of his signature to the previously filed document.

## II.

F&M states as seven separate issues what we think are more appropriately stated as two issues:

> Whether the trial court erred in concluding that F&M was acting as a broker within the meaning of the Interstate Commerce Act when it brought the UPS/Dell account to Christenberry.
>
> Whether the trial court erred in nullifying the contract as illegal and in violation of public policy.

Christenberry raises the additional issue of whether we are deprived of jurisdiction to hear this appeal by the initial lack of trial counsel's signature on the notice of appeal.

## III.

The Supreme Court has very recently described the standard by which we review a trial court's findings of fact and conclusions of law as follows:

> Where, as here, the trial court sits without a jury, we review findings of facts de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007). Questions of law . . . are reviewed de novo with no presumption of correctness. *Adoption of A.M.H.,* 215 S.W.3d at 809; *Kirkpatrick v. O'Neal,* 197 S.W.3d 674, 678 (Tenn. 2006).

*In re Angela E.,* __ S.W.3d __, No. W2008-00120-SC-R11-PT, 2010 WL 532822 at *5 (Tenn. filed Feb. 16, 2010).

IV.

A.

We will begin with the jurisdictional issue raised by Christenberry. We find no merit in Christenberry's challenge. It argues that because attorney Mickel had not previously entered an appearance or filed anything making him attorney of record, the notice of appeal signed by him and not signed by trial counsel, violated Tenn. R. Civ. P. 11. Rule 11 requires that every pleading "be signed by at least one attorney of record." Christenberry argues, therefore, that the notice must be stricken and the appeal dismissed. It is clear that the notice of appeal filed in this case fulfills the purposes behind requiring a party to file a notice of appeal, "to declare in a formal way an intention to appeal." Tenn. R. App. P. 3 (Advisory Commission Comment Subdivision (f)). We are instructed not to dismiss an appeal "for informality of form or title of notice of appeal." Tenn. R. App. P. 3(f). Rule 11.01 specifically contemplates situations where an "omission of the signature is corrected promptly after being called to the attention of the attorney or party." Therefore, even if the missing signature of trial counsel were to be construed as a defect, we would be inclined to agree with F&M that it was no more than an "informal[]" defect that was cured by the later added signature. *See General Const. Contractors Ass'n. v. Greater St. Thomas Bapt. Church*, No. W1999-00829-COA-R3-CV, 2000 WL 33191362 at *2-3 (Tenn. Ct. App. W.S., filed Oct 9, 2000). However, we find no defect in F&M's notice of appeal. There are "many means of making an appearance" and the "Tennessee Rules of Civil Procedure do not define an appearance." *Patterson v. Rockwell Int'l.*, 665 S.W.2d 96, 99-100 (Tenn. 1984). There is no requirement in the rules of a "formal . . . record entry;" an appearance can be implied from "some act done with the intention of appearing and submitting to the court's jurisdiction." *Id*. at 99. The filing of the notice of appeal by Mickel, an attorney licensed in Tennessee, on behalf of F&M made him an attorney of record. The notice of appeal, therefore, was signed by "one attorney of record."

B.

Moving now to the merits of the appeal, we address first F&M's argument that it did not act as a broker when it brought the UPS/Dell account to Christenberry. We disagree and hold that the trial court's legal analysis is correct and the evidence does not preponderate against the trial court's finding that F&M is a broker with regard to the transaction at issue.

Per the statutory language, the "term 'broker' means a person, other than a motor carrier or an employee or agent of a motor carrier, that . . . sells, offers for sale, negotiates

for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C.A. § 13102(2) (2007). Regulations promulgated under the Interstate Commerce Act provide a similar definition: "Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier." 49 C.F.R § 371.2(a). F&M relies upon the following language in the regulations to exclude it as a broker: "Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." *Id*. The regulations further define "[b]ona fide agents [as] persons who are part of the normal organization of a motor carrier and perform duties under the carrier's directions pursuant to a preexisting agreement which provides for a continuing relationship, precluding the exercise of discretion on the part of the agent in allocating traffic between the carrier and others." *Id.* § 371.2 (b).

Brokers must be "registered." 49 U.S.C.A. § 13901. A broker must be found to be "fit, willing, and able" to comply with the applicable statutes and regulations. 49 U.S.C.A. § 13904(a). The secretary of transportation is assigned the task of promulgating regulations "for the protection of shippers by motor vehicle." *Id.* § 13904(c). Accordingly, brokers must post a bond, and keep detailed records of each transaction including the freight charges collected and the date of payment to the carrier. 49 U.S.C.A. § 13906(b); 49 C.F.R. 371.3. A broker cannot misrepresent its status. 49 C.F.R. 371.7. A broker cannot charge or receive a rebate. 49 C.F.R. 371.9. A broker must separate the funds it receives as a broker from any funds it receives from other business. 49 C.F.R. 371.13. When the broker acts on behalf of another person, it becomes bound to fulfill that person's responsibilities with regard to billing and payments. 49 C.F.R. 371.10.

F&M argues that it was acting as the independent agent of Christenberry, and not as a broker, with regard to the UPS/Dell account. F&M points out that UPS, with whom Christenberry ultimately contracted for the haul, is a registered broker, therefore there was no need for it, as an independent agent, to be registered. The main thrust of F&M's argument is that it did not do the things with regard to this transaction that are normally associated with being a broker, "things" that are specifically addressed in the regulations. Hence, according to it, it cannot be a broker. F&M focuses on the fact that UPS hired Christenberry and paid Christenberry in an attempt to show that neither party needed protection from the other such as would be needed when a shipper contracts with a broker who then contracts with a carrier unknown to the shipper.

F&M's argument makes sense, but it is more appropriately addressed to the legislature. We cannot accept it in the face of the plain language of the definition of broker – found in the statute and the regulations – as including a person who arranges the transportation of property. As the Tennessee Supreme Court stated in *Eastman Chemical Co. v. Johnson*, 151 S.W.3d 503 (Tenn. 2004):

> Our duty in construing statutes is to ascertain and give effect to the intention and purpose of the legislature. Legislative intent is to be ascertained whenever possible from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.

*Id.* at 507 (citations and quotation marks omitted). Although the term broker is defined, the term "arrange," used repeatedly in the regulations, and phrased as "arranging" in the statute, is not defined. It is appropriate, therefore, to look to the dictionary as "the usual and accepted source" for the "natural and ordinary meaning" of the term. *English Mountain Spring Water Co. v. Chumley*, 196 S.W.3d 144, 148 (Tenn. Ct. App. 2005). An accepted definition of arrange that fits this situation and that must have been within the contemplation of Congress in the Interstate Commerce Act is "to bring about an agreement or understanding." Merriam Webster Online Dictionary (2010)(www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary (11th Ed.)). There is an abundance of proof in this case that F&M's efforts brought about the agreement or understanding pursuant to which Christenberry hauled freight on the UPS/Dell account. Little purpose would be served in reciting that proof which was put on by F&M to show that it did indeed have a contract with Christenberry.

We reject F&M's argument that some type of agent other than a "bona fide agent," who can do what F&M does without being a broker, was within the contemplation of Congress and the regulatory authority. Other than the suggestion that it makes sense for the list of non-brokers to be longer, which is more appropriately addressed to the legislature, F&M offers little in the way of statutory construction to show why agents who arrange shipments do not constitute brokers. To the contrary, the listing of "bona fide agent" in conjunction with "employee," and the description of bona fide agents as "persons who are part of the normal organization of a motor carrier" suggests that the group of persons who can act without being a broker is "restricted to the particular thing or subject" listed. *Cellco Partnership v. Shelby County*, 172 S.W.3d 574, 597 (Tenn. Ct. App. 2005). Stated a little differently, the inclusion of bona fide agents with employees in the list of persons who are

not brokers suggests the exclusion of other type of agents from the list of persons who can arrange shipments without being considered brokers. *See*, *id*. Accordingly, we agree with the trial court's usage of the term broker. We further hold that the evidence does not preponderate against the trial court's finding that F&M is a broker.

C.

We now address the issue of whether the trial court was correct in holding that F&M's lack of registration prevents it from enforcing the contract with Christenberry. In the federal courts there are two conflicting schools of thought concerning whether an unlicensed broker can enforce a contract to collect a commission on shipments which it arranges on behalf of a carrier. Each party relies on the federal cases that go its way. One school is represented by *Paul Arpin Van Lines, Inc. v. Universal Trans. Services, Inc.*, 988 F.2d 288 (1st Cir. 1993). In *Paul Arpin*, the first circuit followed the rule that "illegal promises will not be enforced in cases controlled by the federal law." *Id.* at 291(*quoting Kaiser Steel Corp. V. Mullins*, 455 U.S. 72, 77 (1982)). Accordingly the circuit court held as follows:

> [T]he ICC broker requirement was enacted to protect the public from fraud and/or incompetent motor carrier brokers. Although there is no indication that [the broker] was either fraudulent or incompetent, his failure to obtain a broker's license cannot be ignored or forgiven. There is no point in speculating why [the broker] did not obtain a license. The record evinces that he had worked in the field of transportation of household goods for many years. It can, therefore, be fairly inferred that [the broker] knew of the ICC broker's licensing requirement. There was also record evidence from which it could be found that [the broker], in answer to a direct question, stated he had an ICC broker's license. This was a knowing misrepresentation, even though it was not made directly to Arpin. Viewing the facts in light of the applicable case law, we find that it would subvert the public-protection policy of the statute to enforce the unexpired and not performed term of the contract.

*Id.* F&M correctly points out that the broker in *Paul Arpin* was guilty of misrepresenting itself as a broker whereas there is no evidence that F&M misrepresented its status. F&M argues this fact as a distinguishing point which saves it from the holding of *Paul Arpin*. We

are not persuaded that the lack of a misrepresentation calls for a different result under ***Paul Arpin***. The court in ***Paul Arpin*** noted that the broker's misrepresentation "was not made directly to Arpin," and provided no explanation of how the misrepresentation to someone other than the contracting party affected its analysis.

F&M relies on the opposing school of thought as expressed in ***Reo Distrib. Servs. v. Fisher Controls Int'l.***, 985 F. Supp. 647 (W.D.Va. 1995), ***Concord Indus., Inc. v. K.T.I. Holdings, Inc.***, 711 F. Supp. 728 (E.D.N.Y. 1989), and ***Roadmaster (USA) Corp. v. Calmodal Freight Sys.***, Nos. 04-3970 and 04-3995, 2005 WL 2761287 (3d Cir. filed Oct. 26, 2005). All of these cases allowed enforcement of the contract despite the lack of a license. The discussion in the unpublished ***Roadmaster*** opinion is only provided by the court in that case as an alternative to the court's holding that the complaining party "waived [its] argument [that the contract was invalid because the broker acted as an unlicensed broker] because it failed to present it to the District Court." 2005 WL 2761287 at * 2. The court devoted only one short paragraph to the issue as follows:

> Even if Roadmaster had not waived the right to present the issue, its argument lacks merit. Roadmaster seeks to invalidate the contract between itself and Calmodal as illegal, and therefore unenforceable, because Calmodal allegedly violated the Interstate Commerce Act by acting as a broker without a license. However, the Act provides a specific penalty for brokers operating without a license. *See* 49 U.S.C. § 14901(a) (providing that a person that "does not comply with section 13901 ... is liable to the United States for a civil penalty of not less than $500 for each violation and for each additional day the violation continues"). It is inappropriate to "add judicially to the remedies" by rendering a private contract void when a congressional statute provides specific penalties for violation. *See* ***Kelly v. Kosuga***, 358 U.S. 516, 519, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) (holding that a promisor may not avoid performing a legal promise because he elsewhere violated the Sherman Act); ***Concord Industries, Inc. v. K.T.I. Holdings, Inc.***, 711 F.Supp. 728, 729 (E.D.N.Y.1989). Because the subject matter of the Roadmaster-Calmodal contract is legal, it is controlled by ***Kosuga***. *See* ***Northern Indiana Public Service Co. v. Carbon County Coal Co.***, 799 F.2d 265, 273 (7th Cir.1986) (declining to void a contract for illegality because the subject matter of the contract was not illegal).

*Roadmaster*, 2005 WL 2761287 at *2.

*Concord* was quoted in the *Roadmaster* opinion. *Concord* treated the issue of whether the failure to obtain a broker's license rendered the contract unenforceable as a question of first impression. 711 F. Supp at 730. The *Concord* opinion also cites *Kelly v. Kosuga* for the proposition that "a court should not affix the additional sanction of rendering a private contract void unless the legislative history evinces such an intent." *Id.* at 729. Upon finding "no case which states that a violation of a provision of the Act voids completely the enforceability of a private contract," and "no congressional intent to voiding private contracts for violations of these provisions," the district court denied a motion for summary judgment that was based entirely upon the plaintiff's failure to obtain a broker's license. *Id.* at 730.

The most thorough treatment of the issue we have seen is in the *Reo v. Fisher* opinion. The issue was before the court because "Fisher . . . filed a motion for summary judgment, arguing that the alleged contract is void and unenforceable because Reo, at the time the contract was consummated, did not have the authorities required under the Interstate Commerce Act . . . to legally perform its contractual obligations." *Id*. at 648. The district court first certified several questions to the ICC, including the question of whether the lack of a license barred the recovery of lost profits. *Id*. The ICC answered that the question was one of contract law and not within its jurisdiction. The court then looked to Iowa law for the answer and found that

> [t]he Iowa Supreme Court has held that contracts entered into by parties that lack permits necessary to engage in the contracting activity are unenforceable only if (1) the licensing statute expressly voids such contracts, or (2) enforcing such contracts would violate public policy.

*Id.* at 648. The court next found that "[s]ince the [Interstate Commerce Act] does not expressly void contracts made in violation of its provisions, . . . the analysis shifts to whether the contract is unenforceable as violative of public policy." *Id*. at 648-49. The court held that the contract did not violate public policy for the following reasons:

> [T]he underlying purpose of this contract is not in any way illegal. Moreover, there are already sufficient regulatory mechanisms in place to ensure compliance with the ICA's licensing provisions. Thus, voiding the contact here would be

a remedy vastly disproportionate to its deterrent effect.

*Id.* at 649. Fisher argued that congressional intent was irrelevant to whether enforcing the contract would violate the public policy of Iowa, to which the court responded:

> The issue is not so much whether enforcing the contract would violate Iowa public policy, but whether doing so would violate U.S. public policy since the contract at issue is premised upon a violation of a *federal* statute. In other words, if federal interests are not compromised by the court's enforcing this contract, it is difficult to see how Iowa's interests are so compromised. ***Ets-Hokin[and Galvan, Inc. v. Maas Transport, Inc.***, 380 F.2d 258 (8th Cir. 1967)] stands for the proposition that federal interests are not compromised when courts enforce contracts that are premised upon violations of the ICA – Congress simply did not express a desire to void such contracts. Thus, it is difficult to maintain that enforcing such contracts would violate the public policy of Iowa. Indeed, voiding the contract could raise federalism concerns to the extent federal law mandates the enforcement of such contracts.

*Reo*, 985 F.Supp. at 649-50 (footnotes omitted; emphasis in original).

However, "[f]or the sake of completeness," and in spite of being "perplexed as to how enforcement of the contract here could possibly violate the public policy of Iowa if it does not violate federal public policy," the court went on to consider whether the contract would violate Iowa public policy as expressed in that state's case law. *Id.* at 651 n.9 (citations omitted). The court cited ***Water Development Co. v. Lankford***, 506 N.W.2d 763 (Iowa 1993) as a recent holding which "appears to reject the proposition that a contract entered into without the proper license is unenforceable if the licensing statute states or implies that the conduct . . . is prohibited without the license." 985 F. Supp at 651. The test in Iowa, according to *Reo*, is "[t]he degree of the illegal factor, extent of public harm that may be involved, and moral quality of the conduct of the parties in light of prevailing mores and standards of the community." 985 F. Supp at 651 (*quoting **Lankford***, 506 N.W.2d at 766).

It is notable that almost every case we have encountered has recognized that, as a general rule, illegal contracts are not enforceable. However, as conceded by the court in ***Paul Arpin***, "[t]his general rule . . . is almost as much honored in the breach as in the

-14-

observance." 988 F.2d at 290. This appears to be the case in our state as well. The general rule against enforcement of an illegal contract is clearly expressed in *Shirley v. State*, 280 S.W.2d 915, 916 (Tenn. 1995), and *Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999), both of which the trial court in this case relied upon. The general rule was applied to forbid any recovery by an unlicensed building contractor in *Farmer v. Farmer*, 528 S.W.2d 539 (Tenn. 1975) and *Santi v. Crabb*, 574 S.W.2d 732 (Tenn. 1978). However, in *Gene Taylor & Sons Plumbing Co. v. Corondolet Realty Trust*, 611 S.W.2d 572 (Tenn. 1981), the Supreme Court recognized an exception "when forfeiture is required neither by the licensing statute nor by the policy underlying that statute" if necessary to "avoid 'unreasonable penalties and forfeitures.' " *Id*. at 577. The High Court went on the say the following:

> [T]his rule [of nullification] is neither explicitly nor implicitly required by the licensing statute. The rule is a judicial creation designed to further the public policy behind the statute. As such, the general rule need not be applied inflexibly without regard to the facts in a particular case. A leading authority on the law of contracts has stated:
>
>> Where it is clear that the statute requires the license . . . the courts usually . . . hold that bargains made in breach of the law are not enforceable by the wrongdoer. This accords with sound policy except when it operates with disproportionate severity . . . . In general, the nonenforceability of (such) bargains will have a salutary effect in causing obedience to the licensing statute. Therefore, the general rule will no doubt continue to be maintained as the "general" rule, while still permitting the court to consider the merits of the particular case and to avoid unreasonable penalties and forfeitures.
>>
>> Although many courts yearn for a mechanically applicable rule, they have not made one in the present instance. Justice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but repudiating defendants.

-15-

6A A. Corbin, *Contracts* § 1512 at 713, 716 (1962) (cited with approval in ***Farmer v. Farmer***, *supra* at 542.) In the instant case, the appellant contends that the particular facts justify this Court in permitting recovery under a theory of quantum meruit. With regard to the cause of action against the [general contractor] W & W Construction Co., we agree.

In both ***Farmer*** and ***Santi***, the unlicensed contractors were suing the owner of the property where the work was to be done. In the instant case, the appellant contracted with and brought suit against a construction company licensed as a general contractor. Other courts have recognized that the policies that bar recovery against a member of the general public do not apply in suits against licensed professionals in the same business. As stated in ***Kennoy v. Graves***, 300 S.W.2d 568[, 570] (Ky. App. 1957):

> The statute involved, and similar ones, are designed to protect the public from being imposed upon by persons not qualified to render a professional service. The reason for the rule denying enforceability does not exist when persons engaged in the same business or profession are dealing at arms length with each other. In the case before us appellant was in a position to know, and did know, the qualifications of appellee. No reliance was placed upon the existence of a license, as presumptively would be the case if appellee was dealing with the general public. . . .

We adopt this language and refuse to permit W&W Construction Co. to raise the rule of ***Farmer*** as a bar to recovery under a theory of quantum meruit.

***Gene Taylor***, 611 S.W.2d at 575-76 (unnecessary citations omitted). The court also noted that the presence of "penalty statutes" had been held by other courts to overcome the rule of nullification, but stopped short of adopting the rationale of those cases because the General

-16-

Assembly had not enacted a penalty against unlicensed contractors until after the cause of action in *Gene Taylor* had accrued. *Id.* at 576-77. One commentator has described *Gene Taylor* as an equitable balancing test that "accords with the balancing test from the Restatement (Second) of Contracts, § 181, *Effect of Failure to Comply with Licensing or Similar Requirement*." 21 Tenn. Practice, *Contract Law and Practice* § 7:20 (2009). The Restatement considers whether the interest in contract enforcement is clearly outweighed by the public policy behind the licensing statute. The rationale of *Gene Taylor* is broad enough to apply to other licensing statutes. Tenn. Practice § 7:21. "True enough, T.C.A. § 62-6-103(b) now allows unlicensed contractors an equitable remedy when they can prove their expenses by clear and convincing proof. The important point is that when the *Gene Taylor* Court decided the case, the statute lacked this provision, which means that the Court's mode of analysis can apply to any statute prohibiting certain conduct." *Id.* The *Gene Taylor* opinion remains good law and has been said by some to not only expand the remedies available to unlicensed parties, but "restrict[] the doctrine permitting the striking down of contracts where a statute 'impliedly' forbids enforcement." *Id.*

The present case involves facts that bear a strong resemblance to those of *Gene Taylor*. The parties were not unsophisticated home-buyers who needed protection from a shoddy builder. They were "professional" businesses engaged in an arms-length transaction. There was a licensed broker, UPS, with whom Christenberry contracted directly for the haul. Under the facts as accepted by the trial court, Christenberry would not have had the UPS/Dell account but for the efforts of F&M. If we are correct that F&M is acting as a broker, penalties are available through the governing agency to dissuade F&M from continuing to operate without a license. We can only speculate that F&M has not thus far obtained a license because it believes its own arguments. There is no evidence of fraud or incompetence on the part of F&M.

While *Gene Taylor* does not appear to place Tennessee law regarding nullification of contracts in complete accord with Iowa law regarding nullification as discussed in *Reo*, the *Gene Taylor* opinion is enough of a retreat from the general rule of nullification as expressed in *Shirley v. State* and *Farmer v. Farmer* that we are comfortable holding that the public policy of Tennessee will not be offended by allowing F&M to recover in the courts of this state even though it was not licensed as a broker as required by federal law. The *Gene Taylor* Court recognized that the reason for the general rule of nullification is "to further the public policy behind the statute." We are persuaded by *Reo* that since the only policy for denying recovery is the "policy behind the [federal] statute," we should focus on whether the federal law intended to deny unlicensed brokers a recovery. We believe *Reo*, which allows recovery, represents a better reasoned approach than *Paul Arpin*. Accordingly, we hold that the lack of a license does not prevent F&M from recovering for Christenberry's breach of contract.

V.

The judgment of the trial court is vacated.  Costs on appeal are taxed to the appellee, Christenberry Trucking & Farm, Inc.  This case is remanded to the trial court, pursuant to applicable law, for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE